Kimberly A. Kralowec (State Bar No. 163158)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Tel: (415) 546-6800
Fax: (415) 546-6801
Email: kkralowec@kraloweclaw.com

Daniel L. Balsam (State Bar No. 260423)
THE LAW OFFICES OF DANIEL BALSAM
2601C Blanding Avenue #271
Alameda, CA 94501
Tel: (415) 869-2873
Fax: (415) 869-2873
Email: legal@danbalsam.com

Jacob Harker (State Bar No. 261262)
LAW OFFICES OF JACOB HARKER
582 Market Street, Suite 1007
San Francisco, CA 94104
Tel: (415) 624-7602
Fax: (415) 684-7757
Email: jacob@harkercounsel.com

Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)

| | |
|---|---|
| EMILY FISHMAN, individually and on behalf of all others similarly situated; and SUSAN FARIA, individually and on behalf of all others similarly situated;<br><br>　　　　　　Plaintiffs,<br>　　　v.<br><br>TIGER NATURAL GAS INC., an Oklahoma corporation;<br>COMMUNITY GAS CENTER, a business entity of unknown organization, and DOES 2-100;<br><br>　　　　　　Defendants. | Case No.:　　　3:17-cv-05351-JCS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. **VIOLATIONS OF CALIFORNIA RECORDING LAW (Cal. Pen. Code § 632 et seq.)**<br>2. **BREACH OF ORAL CONTRACT (Cal. Civ. Code § 1622)**<br>3. **VIOLATIONS OF CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 et seq.)** |

**1**

|   |   |
|---|---|
| ) | **4. FRAUD (Cal. Civ. Code § 1572)** |
| ) | **5. NEGLIGENT** |
| ) | **MISREPRESENTATION (Cal. Civ.** |
| ) | **Code §§ 1573, 1577)** |
| ) | **6. VIOLATIONS OF FALSE** |
| ) | **ADVERTISING LAW (Cal. Bus. &** |
| ) | **Prof. Code § 17500 *et seq.*)** |
| ) | **7. VIOLATIONS OF UNFAIR** |
| ) | **COMPETITION LAW – UNLAWFUL** |
| ) | **PRONG – CALLING NUMBERS ON** |
| ) | **DO NOT CALL LIST (Cal. Bus. &** |
| ) | **Prof. Code § 17200 *et seq.*)** |
| ) | **8. VIOLATIONS OF UNFAIR** |
| ) | **COMPETITION LAW – UNLAWFUL** |
| ) | **PRONG – OTHER STATUTORY** |
| ) | **VIOLATIONS (Cal. Bus. & Prof. Code** |
| ) | **§ 17200 *et seq.*)** |
| ) | **9. VIOLATIONS OF UNFAIR** |
| ) | **COMPETITION LAW – UNFAIR** |
| ) | **PRONG (Cal. Bus. & Prof. Code** |
| ) | **§ 17200 *et seq.*)** |
| ) | **10. VIOLATIONS OF UNFAIR** |
| ) | **COMPETITION LAW –** |
| ) | **FRAUDULENT PRONG (Cal. Bus. &** |
| ) | **Prof. Code § 17200 *et seq.*)** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |

COME NOW PLAINTIFFS EMILY FISHMAN and SUSAN FARIA and file this First

Amended Class Action Complaint against TIGER NATURAL GAS INC., COMMUNITY GAS

CENTER, *et al* and allege as follows:


## I.  NATURE OF THE ACTION

1.      This class action arises out of Defendant Tiger Natural Gas Inc.'s ("Tiger") practice of

falsely advertising its natural gas price protection program (the "Program") to California

consumers and businesses, via telemarketing calls made by its agent Community Gas Center

("CGC") that were recorded without the recipients' consent and, in some cases, were made to

telephone numbers on the Do Not Call list, and fraudulently inducing them to enroll in Tiger's

Program.

2.      Plaintiffs Emily Fishman ("Fishman") and Susan Faria ("Faria") bring this Class Action to recover monetary damages on behalf of themselves and a Class and Sub-Classes – defined in detail below – of California consumers and businesses who received Sales Calls from CGC on behalf of Tiger and whose calls were recorded without their consent.  Tiger/CGC made some of those Sales Calls to telephone numbers on the Do Not Call list.  Some of the recipients of the calls enrolled in Tiger's Program after receiving false representations about PG&E's gas pricing and false representations and advertising (including telemarketing), claiming that Tiger's Program is free and/or that the Program can save customers money versus their current gas provider's rates due to a rate cap.

3.      Plaintiffs seek restitution, injunctive relief, punitive damages, statutory damages, attorneys' fees, and costs, pursuant to statute.

## II.  PARTIES

4.      Emily Fishman ("Fishman") is, and was at all relevant times, more than 18 years of age and a resident of Mill Valley, Marin County, California.  Fishman had no prior business relationship with Tiger/CGC before receiving their Sales Call and never requested to receive their Sales Call.

5.      Susan Faria ("Faria") is, and was at all relevant times, more than 18 years of age and a resident of Oakland, Alameda County, California.  Faria had no prior business relationship with Tiger/CGC before receiving their Sales Call and never requested to receive their Sales Call. Faria was more than 65 years old when she received Tiger/CGC's telephone solicitation.  Faria received Tiger/CGC's Sales Call at her telephone number which was on the Do Not Call list at the time and had been for more than 10 years.

6.      Tiger Natural Gas Inc. ("Tiger") is, and was at all relevant times, an Oklahoma corporation with a primary place of business in Tulsa, Oklahoma.  Tiger claims that it has been in business for more than 25 years, supplying natural gas to more than 43,000 customers in more than 20 states.  *See* http://tigernaturalgas.com/about.  Tiger has been registered with the California Secretary of State to do business in California since 2002.

7.      Community Gas Center ("CGC") – formerly identified as DOE 1 – is, and was at all relevant times, a business entity of unknown organization claiming its address to be both a Regus executive suite in San Francisco, California and a Post Office Box in Largo, Florida.  Plaintiffs

are informed and believe and thereon allege that CGC acts as Tiger's agent for purposes of calling potential customers to advertise Tiger's products and services, and that Tiger wrote or at least approved the telemarketing scripts executed by CGC and its agents when they called Plaintiffs and Class Members.

8.      The true names and capacities, whether individual, corporate, associate, representative, alter ego or otherwise, of defendants and/or their alter egos named herein as DOES 2-100 inclusive are presently unknown to Plaintiffs at this time, and are therefore sued by such fictitious names pursuant to California Code of Civil Procedure § 474.  Plaintiffs will amend this Complaint to allege the true names and capacities of DOES 2-100 when the same have been ascertained.  Plaintiffs are further informed and believe and thereon allege that DOES 2-100 were and/or are, in some manner or way, responsible for and liable to Plaintiffs and the Class for the events, happenings, and damages hereinafter set forth below.

## III.  JURISDICTION AND VENUE

9.      Although neither Fishman, Faria, nor any other single Class Member claims damages over $75,000, Tiger removed this Action from the Superior Court of California, County of Marin under the Class Action Fairness Act, claiming that there is more than $5 million in controversy, at least one Plaintiff (Fishman) is a citizen of a different state from Tiger (Oklahoma), and there are more than 100 Class Members.  *See* 28 U.S. § 1332(d).

10.     Venue is proper in the U.S. District Court for the Northern District of California because Tiger's contract with Fishman was to be performed in Marin County, within the Northern District of California, and Tiger's liability to Fishman arose in Marin County.  *See* 28 U.S.C. § 1446(a).

## IV.  STATEMENT OF FACTS

11.     All allegations in this Complaint are based on information and belief and/or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Whenever allegations in this Complaint are contrary or inconsistent, such allegations shall be deemed alternative.

**A.  Tiger's Natural Gas Price Protection Program**

12.     One of Tiger's products is a natural gas price protection program (the "Program"), a purportedly "free" plan by which Tiger purportedly charges customers a variable rate for supplying natural gas based on the market price, but with a price cap of $0.69 per therm.[1]

13.     When a customer chooses to purchase or "procure" gas from Tiger, the gas is delivered over existing pipes, e.g., by PG&E.  Thus, a customer who buys gas from PG&E has a single line item for "Gas Charges" on his/her utility bill, whereas a customer who buys gas from Tiger has separate line items for "PG&E Gas Delivery Charges" and "Tiger Natural Gas Inc. Gas Procurement Charges."

14.     In actuality, and as alleged in more detail below, Tiger's Program is far from "free."  The purportedly "free" Program also entailed a $0.05 daily charge, for which Tiger never obtained its customers' informed agreement.  In fact, customers who signed up for Tiger's Program immediately experienced a significant increase in their gas prices, because unknown to consumers, Tiger adds a large surcharge to the market rates that the customers would otherwise have been charged by PG&E (or other utility).  And while Plaintiffs are informed and believe and thereon allege that Tiger never charged more than $0.69 per therm, Tiger fundamentally misrepresented the value proposition of the Program by falsely leading prospective customers to believe that PG&E would be raising its procurement rates and by setting a price cap far above the maximum rate that PG&E could possibly charge.

**B.  Tiger/CGC Called Fishman to Advertise the Tiger Natural Gas Price Protection Program, Their Representations Were False, and They Recorded the Call Without Fishman's Consent**

15.     Prior to August 18, 2015, Fishman purchased natural gas from PG&E for home use.

16.     On August 18, 2015, Tiger, by its agent CGC and CGC's Customer Service Representative ("CSR") Olivia Brown ("Brown"), called Fishman at her home (landline) telephone number (the "Sales Call").  Exhibit A is a transcript of the Sales Call and is incorporated in this Statement of Facts as if set forth in full.  Certain parts, including confidential information, are summarized.

---

[1] A "therm" – short for 100,000 British Thermal Units – represents the heat energy in natural gas.  Natural gas is typically priced to customers in therms and the volume of gas used appears on billing statements in therms.  *See* http://mapawatt.com/2010/02/17/what-therm.

**FIRST AMENDED CLASS ACTION COMPLAINT**

17.     Tiger/CGC's objective in calling Fishman was to solicit her to sign up for the Program and buy Tiger's natural gas, instead of continuing to buy natural gas from PG&E.  Of course, PG&E would continue to deliver the gas.

18.     Tiger/CGC recorded the Sales Call to Fishman.  Tiger/CGC never asked for Fishman's consent to record the Sales Call.  Indeed, Tiger/CGC never disclosed to Fishman that they were recording the Sales Call.

19.     Fishman first learned that Tiger/CGC recorded the call on August 28, 2016.  Fishman did *not* hear periodic beeps during the Sales Call that might have suggested that Tiger/CGC were recording it.  After nine months of increased gas charges from Tiger's Program, and with no signs that the Tiger program would ever save her money, Fishman contacted an attorney. Fishman's counsel sent a letter to Tiger on July 8, 2016 – within one year of Fishman's agreement to purchase Tiger gas – alleging various unlawful conduct.  Tiger's former counsel, Gregory Klatt, responded and claimed that Fishman had her facts wrong about Tiger's offering, and to prove it, on August 28, 2016, Mr. Klatt voluntarily provided a recording of Tiger/CGC's third-party verification call.  The next day, Mr. Klatt voluntarily provided a recording of Tiger/CGC's Sales Call to Fishman.  The fact of the recording was within the exclusive knowledge of Tiger/CGC, until Mr. Klatt provided it to Fishman's counsel, and Fishman could not, by reasonable diligence, have discovered the fact of the recording any sooner than she did. Fishman then filed this Action within one year of learning that Tiger/CGC had recorded the Sales Call to her.

20.     Brown began the Sales Call by claiming that she was calling from "Community Gas Center."  Brown did not disclose that she was really calling on behalf of Tiger until nearly four minutes into the Sales Call.

21.     Tiger/CGC expressly claimed that they were making Sales Calls to every single PG&E customer to advertise the Program and solicit their business.

22.     Tiger/CGC admitted on the Sales Call that they knew that Fishman was a resident of California.

23.     Tiger/CGC claimed that "several [PG&E] rate increases [had] already started," including an "18.8% increase [for natural gas that] had started this year," and that Fishman would "see another 33% increase over the next three years" because the "California Public Utilities Commission ("PUC") has processed that request from PG&E," but Tiger's "price protection for

all the residential customers . . . will protect customers from the supply rate increases for the next three years."

24.     The PUC did not approve a 33% rate increase for PG&E's natural gas *procurement* rates, as Tiger/CGC led Fishman to believe.  In fact, the PUC approved a *27% rate increase for gas transmission and storage*.[2]  By misrepresenting the amount by which PG&E could raise its gas procurement prices, Tiger/CGC attempted to make Tiger's own price cap seem even more beneficial to customers.

25.     Tiger/CGC's claim that an 18.8% price increase for PG&E's natural gas procurement rates had already started for 2015 was false.  PG&E gas procurement rates were not increasing by 18.8% when Tiger/CGC called Fishman in August 2015.  In fact, PG&E's average gas procurement rate in 2015 was $0.38103 per therm, *34% less* than the average rate in 2014 of $0.57893 per therm.  And PG&E's average gas procurement rate in 2016 was $0.31644, *17% less* than 2015.  PG&E's average gas procurement rate from January-October 2017 was $0.38096 per therm,[3] slightly higher than 2016, but still 45% *less* than Tiger's price cap of $0.69 per therm.

26.     Because PG&E still bills Tiger customers for gas delivery, gas delivery charges are a constant.  Any savings that Tiger gas customers could possibly realize from enrolling with Tiger would have to be for gas procurement, not delivery.  Put another way, regardless of how much PG&E might raise customers' gas *delivery* charges, that has nothing whatsoever to do with any hypothetical savings on gas *procurement* charges customers might see by switching to Tiger.

27.     Tiger/CGC falsely claimed that gas supply rates were increasing when in fact they were decreasing.  PG&E's delivery rates were increasing, but not supply rates.

28.     Tiger/CGC claimed that Tiger had set up a "a price protection" program, which Tiger/CGC said was "a free service" "which will protect customers from … supply rate increases."  Tiger/CGC told Fishman, and other customers, that it would charge "a variable rate [for natural gas] based on the market price with a cap at 69 cents."  According to Tiger/CGC, "It's all free."

---

[2] Robert Walton, *California PUC Approves Gas Rate Hike for California Utilities and SoCal Gas*, Utility Dive, June 28, 2016, http://www.utilitydive.com/news/california-puc-approves-gas-rate-hike-for-california-utilities-and-socalgas/421697.

[3] PG&E Gas Rates, https://www.pge.com/tariffs/GRF.SHTML#RESGAS (last visited Oct. 5, 2017) and click "Residential (JAN 2014 – DEC 2015)" link.

29.     Tiger/CGC did not disclose that, in fact, Tiger would add an undefined surcharge to the "variable rate based on the market price," that Tiger would use this surcharge to line its own pockets, and that customers' gas rates would immediately go up if they enrolled in the Program.

30.     Tiger/CGC did not disclose that Tiger would add a daily charge of $0.05 to the bills of customers enrolled in the Program.

31.     Tiger/CGC described the Program as "great" specifically because "Say for instance if PG&E down the line in the next year paid $1.06 per therm for the gas, you wouldn't be charged $1.06 per therm for your gas.  You would be charged 69 cents because it can never go over that price."  But the Program was not, in fact, "great," because PG&E's rates would not be that high even if PG&E had raised its procurement rates by 33%, as Tiger/CGC falsely claimed would soon happen.

32.     Tiger/CGC repeated several times that the Program was entirely "free."  According to Tiger, the Program was "a free service" that would "protect customers."  Tiger/CGC never disclosed any charges for the Program other than for buying the gas itself.  Fishman did not believe that Tiger was providing the gas itself for free, but relying on Tiger/CGC's statements, believed that there were no *other* charges.  Also, Tiger never disclosed that a surcharge would be added to the "variable rate based on the market price," or that Tiger would immediately begin charging customers more than PG&E would have charged for the same natural gas.  Fishman did not believe that Tiger would charge her more for gas than PG&E was already charging her, and Fishman did not expect her bills to immediately and significantly increase as the direct result of enrolling in Tiger's Program.

33.     By presenting a realistic-sounding scenario that nevertheless: a) falsely claimed PG&E's gas procurement rates were increasing when they were really decreasing, and b) included an impossibly high price point for PG&E's gas procurement well over Tiger's price cap, Tiger/CGC falsely ascribed a customer benefit to the Program and the price cap, and actually misled Fishman – and would have misled any reasonable consumer – into believing that she would save money on her gas bill by switching her gas procurement from PG&E to Tiger's Program.

34.     Tiger/CGC advised Fishman that "Everything will stay the same with your PG&E utility service.  So you'll pay that bill just like you do now."

35.     Tiger/CGC had superior knowledge than Fishman did about the natural gas market and Tiger's Program.

36.     During the Sales Call on August 18, 2015, Fishman entered into an oral contract with Tiger, by its agent CGC, to buy Tiger's gas via the Program in reliance on Tiger/CGC's statements during the Sales Call.  All terms of the oral contract were stated in that Sales Call.  *See* Exhibit A.

37.     Fishman is informed and believes and thereon alleges that Brown was following a script prepared for her by Tiger/CGC when Brown called her.  Fishman is informed and believes and thereon alleges that Brown and Tiger/CGC's other CSRs were required to follow that script as closely as possible, with little if any room for deviation or improvisation.

38.     Fishman is informed and believes and thereon alleges that all Class members received comparable Sales Calls by Tiger/CGC based on the same script.  Even if every single word were not exactly the same, Fishman is informed and believes and thereon alleges that:

- Tiger/CGC did not instruct any of the CSRs to notify and obtain consent from prospective customers to record their telephone calls;

- Tiger/CGC's CSRs did not notify and obtain consent from prospective customers to record their telephone calls;

- All of Tiger/CGC's Sales Calls were recorded;

- Tiger/CGC and their agents were not trained in the proper use of the Do Not Call list and called prospective customers' telephone numbers on the Do Not Call list;

- Tiger/CGC instructed all of their CSRs to communicate to all Class Members, and Tiger/CGC's CSRs did communicate to all Class Members, that PG&E had already started significantly increasing its natural gas procurement rates and would continue to do so;

- Tiger/CGC instructed all of their CSRs to communicate to all Class Members, and Tiger/CGC's CSRs did communicate to all Class Members, that the Program is "free" and Tiger's gas price would be capped at $0.69 per therm, benefitting Tiger's customers by capping the price below what PG&E (or their current gas provider) could possibly charge them, e.g. $1.06 per therm;

- Tiger/CGC instructed all of their CSRs not to inform Class Members, and the CSRs did not in fact inform Class Members, that Tiger would immediately begin charging customers a $0.05 daily charge for participating in the Program; and

- Tiger/CGC instructed all of their CSRs not to inform Class Members, and the CSRs did not in fact inform Class Members, that Tiger would immediately begin adding a surcharge to the market price, thereby charging them more than PG&E (or their current gas provider) would have charged them for the same natural gas.

39.     Brown acted as CGC and Tiger's agent, within the scope of her authority, when she called Fishman.  *See* Cal. Civ. Code § 2316.

40.     Even if Brown and CGC did not have actual authority to make the claims that she made, Fishman reasonably believed that Brown and CGC had ostensible authority to make those claims on behalf of Tiger.  *See* Cal. Civ. Code § 2317.

41.     Fishman is informed and believes and thereon alleges that Tiger/CGC also made Sales Calls to customers of other gas providers in California, not just PG&E.

42.     Only *after* the Sales Call concluded, Brown switched Fishman to an automated verification system that asked for Fishman's consent to record *that* second call, and stated that Tiger would mail Fishman a copy of the terms and conditions within three business days. Fishman had no idea what those additional terms might have been when she entered into the oral contract with Tiger.  Thus, those additional terms and conditions, provided after the oral contract was made, were not part of the oral contract.  *See* Cal. Civ. Code § 1580.  Fishman does not recall if she ever received the mailed copy of the Program's terms and conditions.  Fishman did not agree to any terms and conditions beyond those stated during the Sales Call.

43.     The automated verification process also stated that "PG&E will continue to deliver your natural gas, send your monthly PG&E bill, and provide the exact same utility service."  The automated verification system also made no mention of any $0.05 daily charge to participate in Tiger's Program.

**C.   Tiger/CGC Called Faria at Her Telephone Number on the Do Not Call List to Advertise the Tiger Natural Gas Price Protection Program, Their Representations Were False, and They Recorded the Call Without Faria's Consent**

44.     Prior to April 2015, Faria purchased natural gas from PG&E for home use.

45.     In April or early May 2015, Tiger, either itself or by an agent, called Faria at her home (landline) telephone number.

46.     Faria's home (landline) telephone number has been on the Do Not Call list since 2004, without any lapses.

47.     Faria is informed and believe and thereon alleges that Tiger and CGC had not instituted procedures for maintaining a list of persons who request not to receive their telemarketing calls. *See* 47 C.F.R. 64.1200(d).  Specifically, as evidenced by the very fact that she received a Sales Call from Tiger/CGC, Faria is informed and believes and thereon alleges that: a) Tiger and CGC do not have written policies, available upon demand, for maintaining a do-not-call list; and b) Tiger and CGC personnel engaged in any aspect of telemarketing were not informed and trained in the existence and use of the Do Not Call list.

48.     Faria is informed and believes and thereon alleges that Tiger/Tiger's agent recorded the Sales Call to her without disclosure and without obtaining her consent.

49.     Faria is informed and believes and thereon alleges that the Sales Call she received was substantively similar to the Sales Call that Fishman received.  *See* Exhibit A.  Faria is informed and believes and thereon alleges that Tiger/CGC's Sales Call to her was also recorded without her consent.  Faria was also misled to believe that she would save money on her gas bill by switching her gas procurement from PG&E to Tiger.  Faria was also misled to believe that PG&E was increasing its gas procurement rates when in fact the rates were decreasing, that it was free for her to participate in Tiger's Program, that her gas procurement rates would not go up with Tiger, and that there would be no additional charges (*e.g.*, $0.05 per day or surcharges on top of the market rate for natural gas).  Faria entered into an oral contract to enroll in Tiger's Program and purchase Tiger's gas in reliance on Tiger's statements.  Faria does not recall ever receiving any subsequent terms and conditions in the mail, but even if she had, she did not agree to any subsequent terms and conditions.

**D.   Fishman's Gas Bills Were Far More Expensive With Tiger Than They Would Have Been If She Had Stayed With PG&E**

50.     Tiger supplied Fishman's natural gas beginning on September 17, 2015, with charges first appearing on the bill with the statement date of October 22, 2015.

51.     Fishman is informed and believes and thereon alleges that Tiger did not charge her "a variable rate based on the market rate" for gas procurement, as promised during the sales call, but rather a rate that was much higher – in some months, as much as three times higher than PG&E's rate – as shown in the chart below.

| Statement Date | PG&E Gas ($/therm) | Tiger Gas ($/therm) | Difference |
|---|---|---|---|
| 10/22/2015 | $ 0.3263 | $ 0.6900 | + 111% |
| 11/24/2015 | $ 0.3553 | $ 0.6900 | + 94% |
| 12/23/2015 | $ 0.3897 | $ 0.6823 | + 75% |
| 1/22/2016 | $ 0.3927 | $ 0.6709 | + 71% |
| 2/24/2016 | $ 0.4058 | $ 0.6555 | + 62% |
| 3/24/2016 | $ 0.2792 | $ 0.5900 | + 111% |
| 4/25/2016 | $ 0.1944 | $ 0.6097 | + 214% |
| 5/24/2016 | $ 0.2517 | $ 0.6513 | + 159% |
| 6/23/2016 | $ 0.2380 | $ 0.6450 | + 171% |

52.     Fishman terminated the oral contract by calling Tiger in May 2016, after realizing that over nine months of Tiger bills, her gas prices were constantly and significantly higher than they would have been if she had stayed with PG&E, and the purported cap showed no signs of ever providing a benefit.  The last day on which Tiger supplied Fishman's natural gas was June 15, 2016, on the bill with the statement date of June 23, 2016.  Tiger supplied Fishman with natural gas for 273 days.

53.     According to Fishman's PG&E bills, over the nine months that she bought Tiger gas, if she had bought PG&E gas, she would have paid $120.75 for gas procurement (excluding delivery).

54.     According to Fishman's PG&E bills, over the nine months that she bought Tiger gas, she paid $233.54 for gas procurement (excluding delivery) – *93% more than PG&E.*

55.     According to Fishman's PG&E bills, over the nine months that she bought Tiger gas, she paid $13.65 for Tiger's (undisclosed) $0.05 daily charge, whereas if she had stayed with PG&E, there would have been *no* daily charges.

56.     According to Fishman's PG&E bills, over the nine months that she bought Tiger gas, she paid Tiger a total of $247.19 for gas procurement plus daily charges, *more than double* the $120.75 that she would have paid to PG&E for gas procurement and no daily charges if she had stayed with PG&E, as shown in the following chart:

| Statement Date | PG&E Gas | Tiger Gas + Daily Charge | Difference |
|---|---|---|---|
| 10/22/2015 | $ 5.22 | $ 12.49 | + 139% |
| 11/24/2015 | $ 12.08 | $ 25.06 | + 107% |
| 12/23/2015 | $ 23.77 | $ 43.07 | + 81% |
| 1/22/2016 | $ 29.45 | $ 51.82 | + 76% |
| 2/24/2016 | $ 22.32 | $ 37.65 | + 69% |
| 3/24/2016 | $ 10.89 | $ 24.51 | + 125% |
| 4/25/2016 | $ 6.22 | $ 21.01 | + 238% |
| 5/24/2016 | $ 6.04 | $ 17.18 | + 184% |
| 6/23/2016 | $ 4.76 | $ 14.40 | + 203% |
| **Total** | **$ 120.75** | **$ 247.19** | **+ 105%** |

57.     In the nine months Fishman was a Tiger customer, PG&E's gas procurement price ranged from $0.3263 to $0.4058 per therm, averaging $0.3392.  So even if PG&E did increase its *procurement* rates by *33%* as Tiger claimed – setting aside the fact that the Public Utilities Commission actually approved a *27%* increase for *transmission and storage*, even as procurement rates were decreasing significantly – that would have been $0.4511.  A 33% increase on the highest month during that nine-month period would have been $0.5397.  Thus, when Tiger called Fishman and posited that PG&E could charge its customers $1.06 per therm, that was a deliberate misrepresentation meant to deceive Fishman about Tiger's gas prices, PG&E's possible gas prices, and the relative value of Tiger's Program and the price cap.

58.     Tiger's fraud and breach of contract were not that Tiger ever charged more than $0.69 per therm (it didn't), but rather that Tiger/CGC knowingly misrepresented the fundamental value proposition of the Program in the first place when they called Fishman by: a) falsely claiming that PG&E's gas procurement rates were increasing when they were actually decreasing; b) expressly claiming that it was "free" to participate in the Program; and c) presenting an impossible scenario – namely, PG&E charging $1.06 per therm for gas procurement within a year.  These representations were false and were designed to confuse and mislead Fishman and other Enrollee Sub-Class Members, and they did confuse and mislead Fishman and other Enrollee Sub-Class Members.  Tiger's failure to disclose that Fishman's and other Enrollee Sub-Class Members' gas prices would immediately go up, when affirmatively telling them that the Program was "a free service," also constitutes fraud and breach of contract, as further alleged below.

59.     Indeed, Tiger/CGC's CSR Brown implicitly encouraged Fishman not to read her bill too closely… presumably because they feared that Fishman might quickly discover that she was paying twice as much for her natural gas procurement.  Tiger/CGC's description of the Program

as "great" was not merely general advertising puffery, but instead materially false and misleading because Tiger/CGC provided specific (false) evidence of its greatness: a) by describing it as free despite the $0.05 daily charge and despite the fact that her rates would immediately go up, and b) because the price cap of $0.69 per therm had no value whatsoever to Fishman or any other consumer, since PG&E's gas procurement rates were decreasing and PG&E's maximum possible rate was still nowhere close to the cap.  And at the same time, Tiger charged significantly more than PG&E charged for gas.

**E.  Faria's Gas Bills Were Far More Expensive With Tiger Than They Would Have Been If She Had Stayed With PG&E**

60.     Tiger supplied Faria's natural gas beginning on May 7, 2015, with charges first appearing on the bill with the statement date of June 9, 2015.  Faria discovered that her gas prices had increased with Tiger after she received the June 9, 2015 bill, and promptly canceled service. Tiger supplied Faria's gas for a second month, with a statement date of July 8, 2015, until the cancellation took effect.  In total, Tiger supplied Faria's gas for 61 days.

61.     According to Faria's PG&E bills, over the two months that she bought Tiger gas, she paid Tiger a total of $61.87 for gas procurement plus daily charges, *more than double* the $27.82 that she would have paid to PG&E for gas procurement and no daily charges if she had stayed with PG&E, as shown in the following chart:

| Statement Date | PG&E Gas | Tiger Gas + Daily Charge | Difference |
|---|---|---|---|
| 6/9/2015 | $ 13.70 | $ 32.87 | + 140% |
| 7/8/2015 | $ 14.12 | $ 29.00 | + 106% |
| **Total** | **$ 27.82** | **$ 61.87** | **+ 122%** |

**F.  Terms and Conditions Disclosed *After* Tiger's Sales Call and the Formation of the Contract are Not Binding**

62.     Plaintiffs do not concede that Tiger mailed them any terms and conditions after the contracts was formed during the Sales Calls.

63.     But, even if Tiger did mail Plaintiffs and the Enrollee Sub-Class terms and conditions after the Sales Calls, those terms and conditions are not binding because "Consent is deemed to be fully communicated between the parties as soon as the party accepting a proposal [each Plaintiff] has put [her] acceptance in the course of transmission to the proposer [Tiger/CGC] [ ]." *See* Cal. Civ. Code § 1583.  Here, Tiger/CGC made offers during Sales Calls directed to California related to delivering natural gas in California, and Plaintiffs and the Enrollee Sub-Class accepted the offers, confirming the acceptance via the automated verification system.

Plaintiffs and the Enrollee Sub-Class never consented to anything that was not stated during the Sales Calls.  Even *if* Tiger could clarify the terms of the oral contract by subsequently mailing terms and conditions to Plaintiffs and the Enrollee Sub-Class (which they do not concede), and even if Tiger did mail terms and conditions to Plaintiffs and the Sub-Class (which they do not concede), Tiger cannot materially change the terms of the contract by mailing a subsequent, unaccepted offer to modify the contract.

64.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, and that those terms and conditions state that the agreement was governed by Oklahoma law.  But Tiger/CGC said nothing about Oklahoma law during the Sales Calls.  Plaintiffs and the Enrollee Sub-Class did not know of this purported term before entering into an oral contract with Tiger, and never agreed to it.  *See* Cal. Civ. Code § 1580.

65.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, and that those terms and conditions refer to a "daily nickel" charge; i.e., Tiger would charge customers, in addition to the gas itself, $0.05 per day of service.  But Tiger/CGC said nothing about a $0.05 daily charge during the Sales Calls.  Plaintiffs and the Enrollee Sub-Class did not know of this purported term before entering into an oral contract with Tiger, and never agreed to it.  *See* Civ. Code § 1580.

66.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, and that those terms and conditions refer to an "adder" charge of up to $0.20 per therm that Tiger would charge customers on top of the Bidweek Survey index for California PG&E Citygate.  But Tiger/CGC said nothing about an adder charge during the Sales Calls.  Plaintiffs and the Enrollee Sub-Class did not know of this purported term before entering into an oral contract with Tiger, and never agreed to it.  *See* Civ. Code § 1580.  Moreover, even *if* the adder charge were part of the contracts, Tiger's procurement rate was *more* than 20 cents higher than PG&E's rate in each of Fishman's nine months of Tiger service.  *See* ¶ 51, *supra*.

67.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, and that those terms and conditions say that Plaintiffs and the Enrollee Sub-Class could cancel the agreement without penalty and rescind the agreement by calling CGC within three business days of enrolling.  But that would make the terms and conditions unconscionable because: a) it is highly unlikely Plaintiffs and the Enrollee Sub-Class would have received the mailing and had an opportunity to review it within three business days;

indeed, California law allows for five calendar days for mailing in-state and 10 calendar days for mailing out-of-state. *See* Cal. Code Civ. Proc. § 1013(a); and b) Plaintiffs and the Enrollee Sub-Class did not receive their first PG&E bill including Tiger gas until two months after the Sales Calls – and would not have had an opportunity within three business days to realize how much more Tiger was charging them for gas than PG&E would have charged them.

68.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, but Plaintiffs are informed and believe and thereon allege that those terms and conditions do *not* contain an integration provision; therefore, the written terms and conditions (e.g. $0.05 daily charge and adder charge) cannot supplant the oral representations Tiger/CGC made during the Sales Calls (e.g., totally free to participate in the Program).

69.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, but Plaintiffs are informed and believe and thereon allege that those terms and conditions set forth a 36 month term that a customer can only cancel upon 90 days written notice to CGC prior to automatic renewal for another 36 month term.  Nevertheless, Tiger allowed Plaintiffs to cancel service by making telephone calls after far less than 36 months of service.  This further evidences that Tiger did not intend the supposedly-mailed terms and conditions to be binding where they conflict with the terms of the oral agreements previously made during the Sales Calls.

70.     Tiger may claim that it mailed Plaintiffs and the Enrollee Sub-Class terms and conditions after the contracts were formed, but Plaintiffs are informed and believe and thereon allege that those terms and conditions do *not* contain a class action waiver/arbitration provision.  Nor did Tiger/CGC say anything about a class action waiver/arbitration provision during the Sales Calls.

**G.  <u>Tiger's Website Falsely Claimed That There Were ZERO Complaints Filed with the Better Business Bureau</u>**

71.     According to Tiger's website at the time, there were "ZERO complaints" with the Better Business Bureau.  <u>Exhibit B</u> is a true and correct copy of a page from Tiger's website, *http://tigernaturalgas.com/switch-pge-customer-service*, as of July 2016 and is incorporated as if set forth in full in this Statement of Facts.

72.     According to the Better Business Bureau of Oklahoma's website, there were 20 complaints filed within the last three years prior to July 2016.  <u>Exhibit C</u> is a true and correct copy of a page from the Oklahoma BBB's website, *http://www.bbb.org/tulsa/business-*

*reviews/natural-gas-companies/tiger-natural-gas-inc-in-tulsa-ok-33000688*, as of July 2016 and is incorporated as if set forth in full in this Statement of Facts.

## V.  CLASS ACTION ALLEGATIONS

73.    Plaintiffs bring this Class Action for damages, restitution and injunctive relief on behalf of the following Class (the "**Class**"): All California consumers and businesses who received a telemarketing call from Tiger or its agents (including but not limited to CGC) that was recorded without consent of the recipients, who became aware of the recording within one year prior to the filing of this Action and continuing until final disposition of the Action.

74.    Plaintiffs bring this Class Action for damages and injunctive relief on behalf of the following Sub-Class (the "**Do Not Call Sub-Class**"): All California consumers and business who received a telemarketing call from Tiger or its agents (including but limited to CGC) at a landline or cellular telephone number that was registered on the Do Not Call list, within four years prior to the filing of this Action and continuing until final disposition of the Action.

75.    Plaintiffs bring this Class Action for damages and injunctive relief on behalf of the following Sub-Class (the "**Enrollee Sub-Class**"): All California consumers and businesses who enrolled in Tiger's natural gas price protection program after receiving representations (including via telemarketing) claiming that the program is "free" and/or that the program can save them money versus their current gas provider's rates due to a rate cap, within: a) two years prior to the filing of this Action and continuing until final disposition of the Action for the Breach of Oral Contract cause of action; b) within three years prior to the filing of this Action and continuing until final disposition of the Action for the Fraud and Negligent Misrepresentation causes of action; and/or c) within four years prior to the filing of this Action and continuing until final disposition of the Action for the False Advertising Law and Unfair Competition Law causes of action.

76.    Plaintiffs bring this Class Action for damages and injunctive relief on behalf of the following Sub-Class (the "**Consumer Enrollee Sub-Class**"): All consumer members, but not business members, of the Enrollee Sub-Class, who enrolled in Tiger's natural gas price protection program after receiving representations (including via telemarketing) claiming that the program is "free" and/or that the program can save consumers money versus their current gas provider's rates due to a rate cap, within three years prior to the filing of this Action and

continuing until final disposition of the Action for the Consumers Legal Remedies Act cause of action.

77.     Excluded from the Class and the Sub-Classes are:

- Defendants' officers, directors, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.

- Any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

78.     **Numerosity (Fed. R. Civ. Proc. 23(a)(1)).**  The proposed Class and Sub-Classes are so numerous that individual joinder of all its members is impractical.  Due to the nature of the trade and commerce involved, and the fact that Tiger/CGC expressly stated that they were calling *all* PG&E customers (not to mention customers of other gas companies such as Southern California Gas Company), Plaintiffs believe that the total number of Class and Sub-Class members is in the thousands and that members of the Class and Sub-Classes are numerous and geographically dispersed throughout California.  While the exact number and identities of the Class and Sub-Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

79.     **Commonality and Predominance (Fed. R. Civ. Proc. 23(a)(2), (b)(3)).**  Common questions of law and fact exist as to all members of the Class and Sub-Classes and predominate over any questions that affect only individual members of the Class and Sub-Classes.  There is a well-defined community of interest in the questions of law and fact involved affecting the Class and Sub-Classes, and these common questions predominate over any questions that may affect individual Class and Sub-Class members.  Common questions of fact and law include, but are not limited to, the following:

a.  Did Tiger/CGC call Class Members to advertise its natural gas price protection program, and record those calls without the recipients' consent?

b.  Did Tiger/CGC call Do Not Call Sub-Class Members at their telephone numbers that were on the Do Not Call list?

c.  Did Tiger/CGC allege to Enrollee Sub-Class Members that PG&E was in the process of raising its gas procurement rates when in fact the rates were decreasing?

d.  Did Tiger/CGC represent to Enrollee Sub-Class Members that it was free to participate in Tiger's natural gas price protection program?

**18**

**FIRST AMENDED CLASS ACTION COMPLAINT**

e. Did Tiger charge Enrollee Sub-Class Members an undisclosed $0.05 daily charge for participating in its natural gas price protection program?

f. Did Tiger/CGC represent to Enrollee Sub-Class Members that it priced its gas based on the market rate?

g. Did Tiger price its gas to Enrollee Sub-Class Members far higher than the market rate?

h. Did Tiger/CGC represent to Enrollee Sub-Class Members that PG&E could charge $1.06 for natural gas procurement within a year?

i. Did Tiger/CGC represent to Enrollee Sub-Class Members that the natural gas price protection program capped gas prices at a price below what PG&E (or another utility) could charge?

j. Could PG&E (or another utility) charge Enrollee Sub-Class Members a rate for natural gas that was higher than Tiger's price cap?

80.     **Typicality (Fed. R. Civ. Proc. 23(a)(3)).**  Plaintiffs' claims are typical of the claims of the members of the Class and Sub-Classes.  Tiger's calls to Plaintiffs and all members of the Class were recorded without their consent.  Faria and all members of the Do Not Call Sub-Class received Tiger's calls at telephone numbers on the Do Not Call list.  Plaintiffs and all members of the Enrollee Sub-Class who agreed to purchase Tiger's gas have been similarly affected by Tiger's common course of conduct since they all received the same representations and: a) They were assessed with $0.05 daily charges; b) The rate they paid for gas was far above the market rate; c) The price cap had no benefit or value because it was set higher than what PG&E or the Sub-Class Members' other former utilities could have charged them; d) They relied on Tiger's claims when they entered into oral contracts with Tiger; and e) Tiger knew at the time represented to Sub-Class members that its representations were not true.

81.     **Adequacy (Fed. R. Civ. Proc. 23(a)(4)).**  Plaintiffs will fairly and adequately represent and protect the interests of the Class and Sub-Classes.  Plaintiffs have no interests adverse to that of the Class and Sub-Classes.  Plaintiffs have retained counsel with substantial experience in handling complex class actions and multi-party litigation and prosecuting false advertising consumer actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this Action on behalf of the Class and Sub-Classes.

82.     **Superiority (Fed. R. Civ. Proc. 23(b)(1), (b)(3)).**  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual

joinder of all members of the Class and Sub-Classes is impractical.  Even if individual Class and Sub-Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Tiger/CGC's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class Members' claims in a single forum.  The conduct of this Action as a Class Action conserves the resources of the parties and of the judicial system and protects the rights of the Class and Sub-Class Members.  Furthermore, for many, if not most, a Class Action is the only feasible mechanism that allows an opportunity for legal redress and justice.  Adjudication of individual class members' claims with respect to Tiger/CGC would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other class members to protect their interests.  All Class Members seek the same statutory damages for Tiger/CGC recording the Sales Calls without consent.  Although individual Enrollee Sub-Class Members will claim different damages based on how long each bought gas from Tiger, and whether they were senior citizens at the time they entered into the oral contracts with Tiger, there are common issues as to liability and the methodology for calculation would be identical (Tiger procurement price minus PG&E procurement price, multiplied by usage, and adding $0.05 per day and the tax differential), with the same enhancement for recipients who were senior citizens when Tiger/CGC called them.

83.     **Injunctive and Declaratory Relief (Fed. R. Civ. Proc. 23(b)(2)).**  As alleged herein and below, Tiger/CGC acted or refused to act on grounds that apply generally to the Class and Sub-Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class and Sub-Classes as a whole.  In particular, as to the Do Not Call Sub-Class, final injunctive and corresponding declaratory relief preventing Tiger and CGC from calling numbers on the Do Not Call list is an appropriate remedy.

**First Amended Class Action Complaint**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31

**FIRST CAUSE OF ACTION**

**[Violations of California Recording Law, Cal. Penal Code § 632 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Class)**
**(Against Tiger and CGC)**

84.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

85.    Plaintiffs bring this Action within one year of learning that Tiger/CGC recorded the Sales Call to them. *See* Code Civ. Proc. § 340. As discussed in more detail above, Plaintiffs could not have, with reasonable diligence, discovered that the Sales Calls were recorded any sooner because such information was exclusively within the possession of Tiger/CGC until Tiger's former counsel provided a recording of the Sales Call to Fishman within one year of Tiger/CGC making the call, and Plaintiffs filed this Action within one year of learning the Sales Calls were recorded.

86.    Plaintiffs are informed and believe and thereon allege that most if not all other Class Members do not know, even as of the filing of this Action, that Tiger/CGC's Sales Calls to them were being recorded, so the statute of limitations had not even started to run for the other Class Members as of the filing of this Action.

87.    Cal. Penal Code § 632(a) prohibits:

> A person [from] intentionally and without the consent of all parties to a confidential communication, [using] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio . . .

88.    Cal. Penal Code § 632(c) states that a:

> "confidential communication" means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

89.    Tiger/CGC's Sales Calls to Plaintiffs and Class Members contained objectively confidential communications because a reasonable consumer would expect that communications involving his or her home address and PG&E account number – which Plaintiffs disclosed

1   during the Sales Calls but are redacted from the transcript of the Sales Call to Fishman in <u>Exhibit</u>
2   <u>A</u> – would be confined to the parties to the call.

3   90.   Tiger/CGC's Sales Calls to Plaintiffs were not made in any kind of public setting.

4   91.   Neither Plaintiffs nor any reasonable consumer would reasonably expect that
5   Tiger/CGC's Sales Calls were being recorded precisely because so many other telemarketers *do*
6   disclose that calls are being recorded, particularly when confidential information is being
7   communicated.

8   92.   Additionally, neither Plaintiffs nor any reasonable consumer would reasonably expect
9   that Tiger/CGC's *Sales* Calls were being recorded precisely because the subsequent automated
10  verification calls *did* request consent to record.  And the fact that the second, verification call
11  obtained Plaintiffs' consent to record does not retroactively cure Tiger/CGC's failure to obtain
12  their consent to record the first *Sales* Calls.

13  93.   To the extent that Tiger/CGC may have called any Class Members on cellular telephones,
14  Tiger/CGC also violated Cal. Penal Code § 632.7, which does not include the requirement of
15  confidential information.

16  94.   Although California's Recording Law is codified in the Penal Code, recipients injured by
17  violations of the statute have standing to pursue remedies even without demonstrating that they
18  suffered actual damages.  *See* Cal. Pen. Code §§ 637.2(a), (c).

19

20  WHEREFORE, Plaintiffs Fishman and Faria and the Class pray for judgment against Defendants
21  as hereinafter set forth.

22

23  ## SECOND CAUSE OF ACTION

24  ### [Breach of Oral Contract, Cal. Civil Code § 1622]
25  ### (By Plaintiff Fishman and the Enrollee Sub-Class)
    ### (Against Tiger)

26

27  95.   Fishman hereby incorporates the foregoing paragraphs as though set forth in full herein.

28  96.   Fishman brings this Action within two years of Tiger calling her to advertise the
29  Program.  *See* Cal. Code Civ. Proc. § 339.

30  97.   Fishman and the Enrollee Sub-Class on the one hand, and Tiger on the other hand,
31  entered into oral contracts by which Fishman and Enrollee Sub-Class Members agreed to

1    participate in Tiger's natural gas price protection program and buy natural gas from Tiger.  *See*

2    Cal. Civ. Code § 1622.

3    98.    By the terms of the contracts, Tiger offered Fishman and Enrollee Sub-Class Members a

4    "free" Program, whereby gas would be priced based on the market price, with no added

5    surcharges or fees, and that there would be a price cap that was a consumer benefit because

6    Fishman and Enrollee Sub-Class Members' former utilities could charge more than that cap.

7    99.    Fishman and Enrollee Sub-Class Members did all, or substantially all, of the significant

8    things that the contract required, namely, pay for Tiger's gas.  Thus, Fishman and Enrollee Sub-

9    Class Members provided consideration to Tiger.

10   100.   All conditions required by the contracts for Tiger's performance had occurred.

11   101.   Tiger breached the contracts by charging Fishman and the Enrollee Sub-Class a daily

12   charge of $0.05 in addition to the gas for participating in the Program, even though Tiger/CGC

13   had represented that the Program was free.

14   102.   Tiger breached the contracts by charging Fishman and the Enrollee Sub-Class prices that

15   were not based on the market rate, and that were far more than the market rate.  For example,

16   even as PG&E's gas procurement rate dropped by 52% from February to April 2016

17   ($0.4058/therm to $0.1944/therm), Tiger's rate dropped by only 7% ($0.6555/therm to

18   $0.6097/therm).

19   103.   Tiger breached its promises by failing to deliver any customer benefits via the price cap,

20   in that the price cap was above what Fishman and the Enrollee Sub-Class's former utilities could

21   and did charge for gas.

22   104.   Fishman and the Enrollee Sub-Class were harmed by Tiger's breach of contract.

23   105.   Whatever terms and conditions Tiger might have mailed to Fishman and the Enrollee

24   Sub-Class after formation of the contracts have no bearing on and could not modify the oral

25   contracts formed during Tiger/CGC's Sales Calls, because, *inter alia*: (a) Plaintiffs are informed

26   and believe that any such subsequently-mailed terms and conditions contradicted the promises

27   during the Sales Calls; and (b) neither Plaintiffs nor Sub-Class Members agreed to be bound by

28   such subsequently-mailed terms and conditions.

29

30   WHEREFORE, Plaintiff Fishman and the Enrollee Sub-Class pray for judgment against

31   Defendants as hereinafter set forth.

## THIRD CAUSE OF ACTION

**[Violations of Consumers Legal Remedies Act, Cal. Civil Code § 1750 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Consumer Enrollee Sub-Class)**
**(Against Tiger)**

106.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

107.    Plaintiffs bring this Action within three years of Tiger calling them to advertise the Program.  *See* Cal. Civ. Code § 1783.

108.    The Consumers Legal Remedies Act ("CLRA") "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *See* Cal. Civ. Code § 1760.

109.    Plaintiffs and Consumer Enrollee Sub-Class members are "consumers" because each is an "individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes."  *See* Cal. Civ. Code § 1761(d).

110.    Tiger's natural gas is a "good" because it is a "tangible chattel bought [ ] for use primarily for personal, family, or household purposes [ ]."  *See* Cal. Civ. Code § 1761(a). Tiger's natural gas price protection program is a "service" because it is "service for other than a commercial or business use, including services furnished in connection with the sale or repair of goods."  *See* Cal. Civ. Code § 1761(b).

111.    Plaintiffs and the Consumer Enrollee Sub-Class members' dealings with Tiger to purchase its gas are "transactions" because they are "agreement[s] between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement."  *See* Cal. Civ. Code § 1761(e).

112.    The CLRA prohibits various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  *See* Cal. Civ. Code § 1770(a).

113.    Tiger violated Section 1770(a)(1) ("Passing off goods or services as those of another"), 1770(a)(2) ("Misrepresenting the source, sponsorship, approval, or certification of goods or services") and (a)(3) ("Misrepresenting the affiliation, connection, or association with, or certification by, another") by claiming at the outset of the call to Plaintiffs and the Sub-Class that its agents were calling on behalf of "Community Gas Center," which implies a neutral

community organization, as opposed to an agent for Tiger – a for-profit entity that competes with their established gas providers.

114.    Tiger violated Section 1770(a)(5) ("Representing that goods or services have characteristics [or] benefits [ ] which they do not have") and Section 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised") by representing to Plaintiffs and the Consumer Enrollee Sub-Class a "price protection" program that would purportedly cap gas prices at a rate lower than PG&E's rate, despite knowing that PG&E's rates could not be more expensive than Tiger's cap of $0.69 during the next three years, and claiming that the cap of $0.69 per therm has financial benefits versus PG&E gas.

115.    Tiger violated Section 1770(a)(8) ("Disparaging the goods, services, or business of another by false or misleading representation of fact") by knowingly falsely claiming to Plaintiffs and the Consumer Enrollee Sub-Class that PG&E's natural gas procurement rates were increasing when in fact they were decreasing, and that PG&E could charge $1.06 per therm, twice the possible rate even assuming Tiger's false claim of a 33% PG&E rate increase were true.

116.    Tiger violated Section 1770(a)(5) ("Representing that goods or services have characteristics [or] benefits [ ] which they do not have") and Section 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised") by representing to Plaintiffs and the Consumer Enrollee Sub-Class that its price protection program as "free" when in fact Tiger charges $0.05 per day and when in fact enrolling in the price protection program would immediately lead to a significant increase in customers' gas prices

117.    Tiger violated Section 1770(a)(5) ("Representing that goods or services have characteristics [or] benefits [ ] which they do not have") and Section 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised") by representing to Plaintiffs and the Consumer Enrollee Sub-Class that its gas would be priced at "a variable rate based on the market price" when in fact the a surcharge was added to the market price to line Tiger's pockets.

118.    Fishman sent a letter to Tiger in California by certified return-receipt mail on June 22, 2017, as required by Cal. Civil Code § 1782, demanding that Tiger immediately correct its unlawful marketing practices, including but not limited to: a) disclosing on its website and in all forms of advertising (including telemarketing) that Tiger does not base its gas procurement prices on market rates; b) disclosing on its website and in all forms of advertising (including

**FIRST AMENDED CLASS ACTION COMPLAINT**

telemarketing) that Tiger's purported "cap" on gas procurement will not actually result in a lower price to consumers than their current gas provider would charge; c) disclosing the $0.05 daily customer charge on its website and in all forms of advertising (including telemarketing); and d) removing all claims from its website that there have been no complaints filed against Tiger with the Better Business Bureau.

119.     Fishman also demanded in her June 22, 2017 letter that Tiger notify her within 30 days from its receipt of the letter that: a) Tiger had identified all similarly situated consumers (i.e., consumers who in the last three years agreed to purchase Tiger gas in reliance on claims that Tiger's price cap could result in lower rates than PG&E, and consumers who in the last three years agreed to enroll in Tiger's price protection program based on claims that the Program was free); b) notified those consumers that Tiger is correcting its unlawful advertising practices; and c) notified those consumers that upon their request, Tiger would reimburse all monies they paid for Tiger gas in excess of their former gas provider's price for each month during which they were Tiger customers, plus $0.05 per day for each day that they were Tiger customers.

120.     Tiger's response was due on June 22, 2017 plus 30 days plus five days for mailing in-state, or July 27, 2017.  Tiger did not provide a code-compliant response to Fishman's letter by July 27, 2017 as required by Cal. Civil Code § 1782.  In fact, Fishman had not received *any* response to her June 22, 2017 letter as of the filing of this Action in the Superior Court of California, County of Marin on August 18, 2017.

121.     Tiger's violations of Cal. Civil Code § 1770 damaged Plaintiffs and the Consumer Enrollee Sub-Class members.  Section 1780 authorizes remedies of actual damages, injunctive relief, punitive damages, costs, and attorneys' fees.  Section 1781 allows Plaintiffs to bring this lawsuit as a class action.

122.     Tiger's violations of the CLRA when it/CGC called senior citizens, such as Plaintiff Faria, carry additional damages as set forth by Cal. Civil Code § 1780(b).  Faria and senior citizens in the Consumer Enrollee Sub-Class suffered substantial economic damage from Tiger's conduct, which caused their natural gas procurement bills to significantly increase versus their PG&E natural gas procurement bills if they had not switched to Tiger.

123.     Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Consumer Enrollee Sub-Class after formation of the contract have no bearing on and cannot retroactively

cure Tiger's CLRA violations, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and Faria and the Consumer Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

### FOURTH CAUSE OF ACTION

**[Fraud, Cal. Civil Code § 1572]**
**(By Plaintiffs Fishman and Faria and the Enrollee Sub-Class)**
**(Against Tiger)**

124.   Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

125.   Plaintiffs bring this Action within three years of Tiger calling them to advertise its natural gas price protection program.  *See* Cal. Code Civ. Proc. § 338(d).

126.   Tiger, by its agents, fraudulently induced Plaintiffs and the Enrollee Sub-Class to enroll in Tiger's Program.  Apparent consent obtained by fraud is invalid.  *See* Cal. Civ. Code § 1567.

127.   Tiger, by its agents, represented to Plaintiffs and the Enrollee Sub-Class via telemarketing that: a) PG&E's natural gas procurement rates were increasing when in fact they were decreasing; b) the Program was "free"; c) Tiger's gas price was based on market price; and d) the price cap delivered customer benefits because the current utility could raise its prices to a price higher than the Program's cap.

128.   Tiger – in the natural gas business – knew that its/CGC's representation that PG&E's rates had already increased by 18.8% and would increase by 33% in the next three years was false.  In fact, PG&E's gas procurement rates were decreasing.  This misrepresentation was material because it made it appear that the Program's price cap could deliver a customer benefit.

129.   Tiger knew that its/CGC's representation that the Program was free (a material fact) was false, because Tiger charges $0.05 per day to participate in the Program in addition to the price of the gas itself, and because Tiger immediately raised customers' gas prices to levels that far exceeded what the original utility would have changed.

130.   Tiger knew that its/CGC's representation that as part of the Program, it charged customers for gas based on the market price (a material fact), was false, because, in fact, Tiger added a large surcharge to the market price to line its own pockets.

131.    Tiger knew that its/CGC's representation that the Program's price cap delivered customer benefits was false.  Tiger/CGC made specific false claims to Plaintiffs when it (falsely) stated as a fact that PG&E could raise its gas procurement price by 33% to $1.06 per therm within the next year.  Tiger made this false claim in order to make its price cap of $0.69 appear to deliver a customer benefit, when in fact the price cap had no such benefit at all.  Thus, Tiger's fraud was not advertising a price cap of $0.69 per therm with the intent of charging more than $0.69, but rather the knowing presentation of an impossible scenario in which PG&E could charge $1.06 per therm, in order to make it appear that the price cap had any value at all to Tiger customers.

132.    Tiger knew that its/CGC's representations that PG&E would be raising its gas procurement rate by 33%, and PG&E could charge customers $1.06 per therm within the next year, was false.

133.    Tiger knew that these representations were false when its agents made such representations, and that its agents made such representations recklessly and without regard for the truth.

134.    Tiger intended that Plaintiffs and the Enrollee Sub-Class rely on its/CGC's representations made during the Sales Calls.

135.    Plaintiffs and the Enrollee Sub-Class reasonably relied on Tiger/CGC's representations made during the Sales Calls by agreeing to sign up for the Program during the Sales Calls.

136.    Plaintiffs and the Enrollee Sub-Class were harmed by relying on Tiger/CGC's representations made during the Sales Calls, because they paid significantly more for natural gas than they would have by staying with their current gas provider.  But for Tiger/CGC's Sales Calls, Plaintiffs and the Enrollee Sub-Class would not have been so harmed.

137.    Plaintiffs and the Enrollee Sub-Class's reliance on Tiger/CGC's representations made during the Sales Calls was a substantial factor in causing their harm.

138.    Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Enrollee Sub-Class after formation of the contract have no bearing on and cannot retroactively cure Tiger's fraud, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and Faria and the Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31

## FIFTH CAUSE OF ACTION

**[Negligent Misrepresentation, Cal. Civil Code §§ 1573, 1577]**
**(By Plaintiffs Fishman and Faria and the Enrollee Sub-Class)**
**(Against Tiger)**

139.    Plaintiffs hereby incorporates the foregoing paragraphs as though set forth in full herein.

140.    Plaintiffs bring this Action within three years of Tiger calling them to advertise its natural gas price protection program. *See* Code Civ. Proc. § 338(d).

141.    "Because negligent misrepresentation is a species of fraud, and not common-law negligence, Plaintiff need not allege a duty of care." *Gilmore v. Wells Fargo Bank N.A.*, 75 F. Supp. 3d 1255, 1269 (N.D. Cal. 2014). *See also Century Surety Company v. Crosby Insurance Inc.*, 124 Cal. App. 4th 116, 129 (4th Dist. 2004) (stating elements of the negligent misrepresentation cause of action without mentioning a duty of care).

142.    Alternatively, to the extent that the Court believes that duty of care is a necessary element for a Negligent Misrepresentation cause of action, Tiger had a duty of care to Plaintiffs and the Enrollee Sub-Class because they are members of "a specific class of persons" (Tiger customers) involved in transactions (oral contracts to purchase Tiger gas) that Tiger, who supplied information to Plaintiffs and the Sub-Class, intended the information to influence. Tiger/CGC undertook to furnish prospective customers with false information about the Program to influence their purchase decisions. Further, Tiger/CGC supplied the information and directed their activity to a closed universe of third parties – current customers of PG&E and other gas utilities who might conceivably be interested in switching to Tiger. Finally, Tiger/CGC supplied information for the sort of use – influencing prospective customers' purchase decisions – from which Plaintiffs and the Enrollee Sub-Class' alleged losses arose. *See Apex Directional Drilling LLC v. SHN Consulting Engineers & Geologists Inc.*, 119 F. Supp. 3d. 1117, 1126-27 (N.D. Cal. 2015).

143.    Tiger, by its agents, represented to Plaintiffs and the Enrollee Sub-Class via telemarketing and/or other forms of advertising important facts such as: a) PG&E's natural gas procurement rates were increasing when in fact they were decreasing; b) the Program was free; c) Tiger's gas price was based on market price; and d) the price cap delivered customer benefits because the current utility could raise its prices to a price higher than the Program's cap.

144.    Tiger – in the natural gas business – knew that its/CGC's representation that PG&E's rates had already increased by 18.8% and would increase by 33% in the next three years was false.  In fact, PG&E's gas procurement rates were decreasing.  This misrepresentation was material because it made it appear that the Program's price cap could deliver a customer benefit.

145.    Tiger/CGC's representation that the Program was free (a material fact) was not true, because it charges $0.05 per day to participate in the Program in addition to the price of the gas itself, and because Tiger immediately raised consumers' gas prices to levels that far exceeded what they would have paid their existing utility for the same gas.

146.    Tiger/CGC's representation that as part of the Program, Tiger charged customers for gas based on the market price (a material fact), was not true.  In fact, Tiger added a large surcharge to the market price, resulting in gas charges significantly exceeding what customers would have paid their existing utility for the same gas.

147.    Tiger/CGC's representation that the Program's price cap delivered customer benefits was not true.  These statements go beyond general advertising puffery because Tiger/CGC made specific false claims to Plaintiffs when it stated as a fact that PG&E could raise its gas procurement price by 33% to $1.06 per therm within the next year.  Tiger made this false claim in order to make its price cap of $0.69 appear to deliver a customer benefit, when in fact the price cap had no such benefit at all.  Thus, Tiger's fraud was not advertising a price cap of $0.69 per therm with the intent of charging more than $0.69, but rather the knowing presentation of an impossible scenario in which PG&E could charge $1.06 per therm, in order to make it appear that the price cap had any value at all to Tiger customers.

148.    Tiger/CGC's representations that PG&E would be raising its gas procurement rate by 33%, and PG&E could charge customers $1.06 per therm within the next year, were not true.

149.    Tiger/CGC's representation that the Program was great for customers was not true.

150.    Even if Tiger/CGC may have honestly believed that the above representations were true, Tiger/CGC had no reasonable grounds for believing that the above representations were true when they made the representations.

151.    Tiger intended that Plaintiffs and the Enrollee Sub-Class rely on its/CGC's representations made during the Sales Calls.

152.    Plaintiffs and the Enrollee Sub-Class reasonably relied on Tiger/CGC's representations made during the Sales Calls.

FIRST AMENDED CLASS ACTION COMPLAINT

153.    Plaintiffs and the Enrollee Sub-Class were harmed by relying on Tiger/CGC's representations made during the Sales Calls, because they paid significantly more for natural gas than they would have by staying with their current gas provider.  But for Tiger/CGC's Sales Calls, Plaintiffs and the Enrollee Sub-Class would not have been so harmed.

154.    Plaintiffs and the Enrollee Sub-Class's reliance on Tiger/CGC's representations made during the Sales Calls was a substantial factor in causing their harm.

155.    Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Enrollee Sub-Class after formation of the contract have no bearing on and cannot retroactively cure Tiger's negligent misrepresentation, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and Faria and the Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**[Violations of False Advertising Law, Cal. Business & Professions Code § 17500 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Enrollee Sub-Class)**
**(Against Tiger)**

156.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

157.    Plaintiffs bring this Action within four years of Tiger calling them to advertise its natural gas price protection program.  *See* Cal. Bus. & Prof. Code § 17208.

158.    Plaintiffs have standing to bring claims under Cal. Business & Professions Code § 17500 *et seq.* because they suffered injury in fact and lost money as the result of Tiger's false advertising.  *See* Cal. Bus. & Prof. Code § 17204.  Fishman lost $126.44 and Faria lost $34.05, plus taxes and sundry charges, by enrolling in Tiger's Program, as compared to their gas charges if they had stayed with PG&E.

159.    Cal. Business & Professions Code § 17500 states:

> It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or *to induce the public to enter into any obligation* relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this

state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, *concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading*, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine [emphasis added].

160.    Tiger falsely claimed in its Sales Calls to Plaintiffs and the Sub-Class that its natural gas price protection program was great *because*: a) it was free; b) gas prices were based on market prices; and c) gas prices were capped at a rate below which PG&E could charge them for gas.

161.    Tiger's claims were false because: a) Plaintiffs and the Sub-Class were charged $0.05 per day to participate in the Program in addition to the cost of the gas; b) Tiger's gas prices were not based on market prices but were actually much higher; and c) Tiger set up a hypothetical – and impossible – scenario in which PG&E could charge Plaintiffs $1.06 per therm for gas procurement within a year so Tiger's price of $0.69 per therm delivered customer benefits, when in truth PG&E's gas procurement rates were decreasing and it could not charge anywhere near $0.69 per therm, so Tiger's price cap had no customer benefit whatsoever.

162.    Cal. Business & Professions Code § 17500.3 states:

It is unlawful for any person to solicit a sale or order for sale of goods or services at the residence of a prospective buyer, in person or by means of telephone, without clearly, affirmatively and expressly revealing at the time the person initially contacts the prospective buyer, *and before making any other statement, except a greeting, or asking the prospective buyer any other questions, that the purpose of the contact is to effect a sale*, by doing all of the following:
(1) Stating the identity of the person making the solicitation.
*(2) Stating the trade name of the person represented by the person making the solicitation.*
(3) Stating the kind of goods or services being offered for sale [emphasis added].

163.    The first thing Tiger's CSR did after Fishman answered the phone was to provide her [first] name: Olivia.

164.    However, Brown did not identify Tiger before making any other statement except greeting or asking Fishman any other questions.  Instead, she claimed she was calling from "Community Gas Center," which a reasonable consumer might believe to be a non-profit organization, and has no obvious connection to Tiger.

165.    Cal. Business & Professions Code § 17508 states:

> (a) It shall be unlawful for any person doing business in California and advertising to consumers in California to make *any false or misleading advertising claim*, including claims that (1) purport to be based on factual, objective, or clinical evidence, (2) compare the product's effectiveness or safety to that of other brands or products, or (3) *purport to be based on any fact* [emphasis added].

166.    Tiger made a false and/or misleading claim to Plaintiffs and the EnrolleeSub-Class when it presented as a fact that PG&E could raise its gas procurement price to $1.06 per therm within the next year.  Tiger made this false and/or misleading claim in order to make its price cap of $0.69 per therm appear to deliver a customer benefit, when in fact the price cap had no such benefit because PG&E could not charge $1.06 per therm, or any amount higher than $0.69 per therm.

167.    Plaintiffs and the Enrollee Sub-Class were harmed by relying on Tiger's representations.

168.    Tiger knew, or in the exercise of reasonable diligence should have known, that its advertisements described above were false and/or misleading.

169.    Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Enrollee Sub-Class after formation of the contracts have no bearing on and cannot retroactively cure Tiger's False Advertising Law violations, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and faria and the Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

**[Violations of Unfair Competition Law ("UCL") – Unlawful Prong, Cal. Business & Professions Code § 17200 *et seq.*]**
**(By Plaintiff Faria and the Do Not Call Sub-Class)**
**(Against Tiger and CGC)**

170.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

171.    Faria brings this Action within four years of receiving a Sales Call from Tiger/CGC in April or early May of 2015 at her landline telephone number that had been on the Do Not Call list since January 2004, without lapses.  *See* Cal. Bus. & Prof. Code § 17208.

172.    Cal. Business & Professions Code § 17200 prohibits any "unlawful" act.  The UCL's unlawful prong "borrows" violations of other laws and makes them independently actionable.

173.    Tiger/CGC's acts and practices alleged herein are "unlawful" within the meaning of the UCL because they violated federal and state laws and regulations prohibiting calls to telephone numbers on the Do Not Call registry.

The Telephone Consumer Protection Act and Implementing Regulations

174.    The Telephone Consumer Protection Act ("TCPA") at 47 U.S.C. § 227(c) incorporates violations as set forth by 47 C.F.R. section 64.1200.  In turn, 47 C.F.R. § 64.1200(c)(2) prohibits telemarketers from calling telephone numbers on the Do Not Call registry.

175.    Tiger/CGC violated the TCPA and 47 C.F.R. § 64.1200(c)(2) by calling Faria's landline telephone number that was on the Do Not Call list, and by making similar calls to the telephone numbers of the Members of the Do Not Call Sub-Class, all of whose numbers, like Faria's, were on the Do Not Call list.

176.    Tiger/CGC violated the TCPA and 47 C.F.R. section 64.1200(d)(1) and (d)(2) by calling Faria's landline telephone number, and the Do Not Call Sub-Class Members' telephone numbers, that were on the Do Not Call list because: a) Tiger and CGC do not have written policies, available upon demand, for maintaining a do-not-call list; and b) Tiger and CGC personnel engaged in any aspect of telemarketing were not informed and trained in the existence and use of the Do Not Call list.

Federal Trade Commission's Telemarketing Sales Rule

177.    The Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq.*, also prohibits telemarketers from calling numbers on the Do Not Call list.  The Telemarketing Sales Rule was adopted pursuant to the authority of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 *et seq.* (hereafter the "Telemarketing Fraud Act").  Congress enacted the Telemarketing Fraud Act in order to "offer consumers necessary protection from telemarketing deception and abuse."  *Id.* at § 6101(5).

178.    Tiger/CGC were engaged in "telemarketing" within the meaning of the Telemarketing Sales Rule, which defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services … by use of one or more telephones and which involves more than one interstate telephone call."  16 C.F.R. § 310.2(gg).  Tiger/CGC were "telemarketers" within the meaning of the Telemarketing Sales Rule, which defines a telemarketer as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer …."  *Id.* at § 310.2(ff).  Tiger should be equally deemed a "telemarketer" because CGC acted as Tiger's agent when CGC made the telemarketing calls.  In addition, Tiger was a "seller" within the meaning of the Telemarketing Sales Rule because Tiger, in connection with a "telemarketing" transaction, provided or offered to provide services to customers in exchange for consideration.  *Id.* at §310.2(dd).

179.    The Telemarketing Sales Rule states that it is "an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in," a list of enumerated abusive acts, one of which is calling any number on the Do Not Call list.  16 C.F.R. § 310.4(b)(1)(iii)(B).  CGC violated this provision by calling Faria and the Do Not Call Sub-Class at their telephone numbers that were on the Do Not Call list.  Tiger violated this provision by causing CGC to make these calls, and because CGC was acting as Tiger's agent in making the calls, as alleged above.

California Law Prohibiting Unsolicited and Unwanted Telephone Solicitations

180.    Cal. Business & Professions Code § 17590 states the California Legislature's intent to protect California residential and wireless telephone subscribers from telemarketing calls made to numbers on the Do Not Call registry.

181.    Tiger/CGC violated Cal. Bus. & Prof. Code § 17592(c), (c)(1) by calling Faria and the Do Not Call Sub-Class at their telephone numbers that were on the Do Not Call list, seeking to sell Tiger's goods and services, namely Tiger's natural gas and the Program.

182.    Plaintiff Faria suffered injury in fact and lost money as the direct result of all of Tiger/CGC's "unlawful" acts and practices alleged above.  *See* Cal. Bus. & Prof. Code § 17204.  But for Tiger/CGC's "unlawful" conduct, described herein, Faria would never have received a phone call from CGC and therefore would not have signed up for Tiger's program and would never have paid the inflated gas prices and daily fees that Tiger charged her.

WHEREFORE, Plaintiff Faria and the Do Not Call Sub-Class pray for judgment against Defendants as hereinafter set forth.

### EIGHTH CAUSE OF ACTION

**[Violations of Unfair Competition Law ("UCL") – Unlawful Prong, Cal. Business & Professions Code § 17200 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Class)**
**(Against Tiger and CGC)**

183.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

184.    Plaintiffs bring this Action within four years of Tiger/CGC calling them to advertise its natural gas price protection program.  *See* Cal. Bus. & Prof. Code § 17208.

185.    Cal. Business & Professions Code § 17200 prohibits any "unlawful" act or practice.  The UCL's unlawful prong "borrows" violations of other laws and makes them independently actionable.

California Statutory Violations

186.    Tiger's acts and practices alleged herein are "unlawful" within the meaning of the UCL because they amount to violations of the California Recording Law (Cal. Pen. Code § 632 *et seq.*), breach of oral contract (Cal. Civ. Code § 1622), violations of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), fraud (Cal. Civ. Code § 1572), negligent misrepresentation (Cal. Civ. Code §§ 1573, 1577), and violations of the False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), as described above.  Each of these statutory violations serves as predicate actions constituting "unlawful" conduct by Tiger.

187.    CGC's acts and practices alleged herein are "unlawful" within the meaning of the UCL because they amount to violations of the California Recording Law (Cal. Pen. Code § 632 *et seq.*), as described above.  This statutory violation serves as a predicate action constituting "unlawful" conduct by CGC.

Violations of the FTC's Telemarketing Sales Rule

188.    In addition, Tiger's and CGC's acts and practices alleged herein are "unlawful" within the meaning of the UCL because they constitute "deceptive telemarketing acts or practices" within the meaning of the Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R. § 310.4(a).  In particular, the Rule provides that "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1)     Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i)     The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer; [and]

(ii)     All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer; ...."

16 C.F.R. § 310.3(a)(1) (footnotes omitted).

189.    The Rule also makes it unlawful for a seller or telemarketer to "misrepresent[], directly or by implication, in the sale of goods or services any of the following material information: (i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer; [or] (ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer; ...."  *Id.* at § 310.3(a)(2).

190.    As alleged above, Tiger/CGC are "telemarketers," and their sales calls to Plaintiffs and the members of the Enrollee Sub-Class constitute "telemarketing," within the meaning of the Telemarketing Sales Rule.  *See* 16 C.F.R. § 310.2(ff), (gg).  Also, Tiger is a "seller" within the meaning of the Telemarketing Sales Rule because Tiger, in connection with a "telemarketing" transaction, provides or offers to provide services to customers in exchange for consideration.  *Id.* at § 310.2(dd).

191.    Tiger/CGC violated the provisions of the Telemarketing Sales Rule quoted above by obtaining Plaintiffs' and the Enrollee Sub-Class members' consent to pay for Tiger's natural gas as part of the Program without truthfully, clearly and conspicuously disclosing the total cost of the Program.  In particular, Tiger/CGC failed to disclose that enrolling in the program would lead to an immediate increase in the cost of the natural gas and would include a $0.05 daily charge.  To the contrary, Tiger/CGC falsely represented that it was "free" to enroll in the program.  Tiger/CGC also violated the quoted provisions of the Telemarketing Sales Rule by failing to truthfully, clearly and conspicuously disclose all material conditions associated with the program, including the fact that customers' gas prices would go up, that a $0.05 daily charge would be charged, and other material terms.

192.    Tiger/CGC cannot escape liability for the violations of the Telemarketing Sales Rule by purporting to mail terms and conditions to Plaintiffs and the Enrollee Sub-Class members after

agreements were made during the Sales Calls, because, *inter alia*, the Rule is clear that the required disclosures must be made *before* obtaining customers' consent to pay.

193.     Plaintiffs suffered injury in fact and lost money as the direct result of all of Tiger/CGC's "unlawful" acts and practices alleged above.  *See* Cal. Bus. & Prof. Code § 17204.  But for Tiger/CGC's "unlawful" conduct, described herein, Plaintiffs would not become enrollees in Tiger's natural gas protection program, and would not have paid any monies to Tiger for purchase of natural gas, including Tiger's undisclosed surcharge and the daily fee.

WHEREFORE, Plaintiffs Fishman and Faria and the Class pray for judgment against Defendants as hereinafter set forth.

## NINTH CAUSE OF ACTION

**[Violations of Unfair Competition Law – Unfair Prong, Cal. Business & Professions Code § 17200 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Enrollee Sub-Class)**
**(Against Tiger and CGC)**

194.     Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

195.     Plaintiffs bring this Action within four years of Tiger/CGC calling them to advertise Tiger's natural gas price protection program.  *See* Cal. Bus. & Prof. Code § 17208.

196.     Cal. Business & Professions Code § 17200 prohibits any "unfair" act.

197.     Plaintiffs have standing to bring claims under Cal. Business & Professions Code § 17200 *et seq.* because they suffered injury in fact and lost money as the direct result of Tiger/CGC's unfair competition.  *See* Cal. Bus. & Prof. Code § 17204.  But for Tiger/CGC's unfair conduct, described herein, Plaintiffs would never have signed up for Tiger's program and would never have paid the inflated gas prices and daily fees that Tiger charged them.

198.     Tiger/CGC's acts and practices, as alleged herein, are "unfair" under all three formulations developed in the case law: the balancing test (*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (4th Dist. 1999); *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965 (1st Dist. 1997)), the tethering test (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999)), and the Section 5 test (*Camacho v. Automobile Club*, 142 Cal. App. 4th 1394, 1403-05 (2d Dist. 2006)).

199.   <u>Tiger/CGC's Conduct was "Unfair" Under the Balancing Test</u>:  "Determination of whether a business practice or act is 'unfair' within the meaning of the [UCL] entails examination of the impact of the practice or act on its victim . . . . balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Klein*, 59 Cal. App. 4th at 969-70 (citations omitted).  "An unfair business practice occurs when the practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647 (2d Dist. 1996) (citation omitted).  Tiger/CGC's conduct was "unfair" under this test because it was immoral, unscrupulous, and unethical to call telephone numbers on the Do Not Call list; there is no redeeming moral or ethical utility to have done so.  Tiger/CGC's conduct was "unfair" under this test because it was immoral, unscrupulous, and unethical to record telephone calls without disclosing and obtaining consent.  Tiger/CGC's conduct was "unfair" under this test because it was immoral, unscrupulous, and unethical to claim that PG&E's gas procurement rates were increasing when they were really decreasing and to create a false and impossible hypothetical situation – that PG&E could charge $1.06 per therm for gas procurement – for the sole purpose of making Tiger's price cap appear to be a customer benefit when in fact Tiger intended to charge and actually charged customers far more for gas than PG&E would have.  Tiger/CGC's conduct was "unfair" under this test because it was immoral, unscrupulous, and unethical to advertise the Program as "free" during the Sales Calls while failing to disclose that Tiger charges a $0.05 daily fee.  Tiger/CGC's conduct was "unfair" under this test because it was immoral, unscrupulous, and unethical to represent during the Sales Calls that Tiger's gas is based on the market price without disclosing a large "add-on" of unstated amount in order to line its own pockets… and then charging more than that add-on.  As the California Supreme Court has explained in a similar context, "protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society."  *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971).

200.   <u>Tiger/CGC's Conduct was "Unfair" Under the Tethering Test</u>:  Under the tethering test, which was developed in the context of actions between competitors, a "finding of unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."  *Cel-Tech*, 20 Cal. 4th at 186-87.  Tiger/CGC's acts and practices of

calling telephone numbers on the Do Not Call list violated the legislatively-declared policies expressed in the Telephone Consumer Protection Act (47 U.S.C. § 227), the Telemarketing Sales Rule (16 C.F.R. § 310), Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising (47 C.F.R. § 64.1200), FCC Do Not Call Regulations (15 U.S.C. § 6153), and Unsolicited and Unwanted Telephone Solicitations (Cal. Bus. & Prof. Code § 17590 *et seq.*). Tiger/CGC violated not only the letter, but also the spirit and purpose, of each of these laws, thereby engaging in "unfair" conduct under the UCL's "tethering test" by giving themselves an unfair advantage over their competitors who follow the law.  Tiger/CGC's false advertising and negligent misrepresentations that PG&E was increasing its gas procurement charges and regarding what PG&E could charge $1.06 per therm in order to make it appear that the Program's price cap had any customer value, to advertise that Tiger charged a rate based on the market rate without disclosing an "add-on" of unstated amount, and to advertise the Program as "free" without disclosing the $0.05 daily charge or the surcharge added by Tiger to the cost of the gas, as described herein, also violated the legislatively-declared policies expressed in the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*) and the False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), thereby engaging in "unfair" conduct under the UCL's "tethering test" by giving themselves an unfair advantage over their competitors.

201.     Tiger/CGC's Conduct is "Unfair" Under the Section 5 Test:  Under the Section 5 test, which is derived from the liability standards governing the Federal Trade Commission Act, conduct is unfair if: "(1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves."  *Boschma v. Home Loan Center, Inc.*, 198 Cal. App. 4th 230, 253 (4th Dist. 2011).  Tiger/CGC's practices have caused and are likely to cause substantial injury to Plaintiff and Enrollee Sub-Class Members, which injury is not and was not reasonably avoidable.  Fishman was overcharged $126.44 and Faria was overcharged $34.05 vs. PG&E's rates, plus taxes and sundry charges, in reliance on Tiger/CGC's representations. Furthermore, Tiger/CGC's practices of falsely representing that PG&E was increasing its gas procurement charges when it was really decreasing them, that PG&E could charge $1.06 per therm in order to make it appear that the Program's price cap had any customer value, advertising that Tiger charged a rate based on the market rate without disclosing an "add-on" of unstated amount, and falsely advertising the Program as "free" without disclosing the $0.05 daily

charge or the Tiger surcharge, is not outweighed by any countervailing benefits to consumers.  If Tiger/CGC had not engaged in this "unfair" conduct, Tiger could not have charged the Enrollee Sub-Class Members and would not have unfairly obtained monies from them.

202.    Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Enrollee Sub-Class after formation of the contracts have no bearing on and cannot retroactively cure Tiger/CGC's "unfair" conduct alleged herein, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and Faria and the Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

## **TENTH CAUSE OF ACTION**

**[Violations of Unfair Competition Law – Fraudulent Prong, Cal. Business & Professions Code § 17200 *et seq.*]**
**(By Plaintiffs Fishman and Faria and the Enrollee Sub-Class)**
**(Against Tiger and CGC)**

203.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

204.    Plaintiffs bring this Action within four years of Tiger/CGC calling them to advertise Tiger's natural gas price protection program.  *See* Cal. Bus. & Prof. Code § 17208.

205.    Cal. Business & Professions Code § 17200 prohibits any "fraudulent"[4] act.

206.    Plaintiffs have standing to bring claims under Cal. Business & Professions Code § 17200 *et seq.* because they suffered injury in fact and lost money as the direct result of Tiger/CGC's unfair competition.  *See* Cal. Bus. & Prof. Code § 17204.  But for Tiger/CGC's fraudulent conduct, described herein, Plaintiffs would never have signed up for Tiger's program and would never have paid the inflated gas prices and daily fees that Tiger charged them.

207.    Any reasonable consumer was likely to be deceived, and Plaintiffs were actually deceived, by Tiger/CGC's claims that: a) PG&E was increasing its gas procurement rates when the rates were actually dropping; b) it was free to participate in the Program; and c) the price cap

---

[4] "'Fraudulent,' as used in the statute, does not refer to the common law tort of fraud but only requires a showing members of the public 'are likely to be deceived.'" *Chavez v. Bank of America Corporation*, No. C-10-0653 JCS, 2012 U.S. Dist. LEXIS 62935 at *18 (N.D. Cal. May 4, 2012) (citation omitted).

of $0.69 per therm had any customer benefit at all and could save them any money versus their current gas provider.  Thus, the unlawful, unfair, and fraudulent claims during Tiger/CGC's Sales Calls were not that Tiger would never charge more than $0.69 per therm – and Tiger didn't do so – but rather by Tiger/CGC creating a false, impossible scenario in which PG&E *could* charge $1.06 per therm within a year to make it *appear* that the Program's price cap had any customer value, even though Tiger knew PG&E could not do so.

208.    Whatever terms and conditions Tiger might have mailed to Plaintiffs and the Enrollee Sub-Class after formation of the contracts have no bearing on and cannot retroactively cure Tiger/CGC's "fraudulent" conduct alleged herein, particularly if those terms and conditions contradict the promises and representations made by Tiger/CGC during the Sales Calls.

WHEREFORE, Plaintiffs Fishman and Faria and the Enrollee Sub-Class pray for judgment against Defendants as hereinafter set forth.

## PRAYER FOR RELIEF

### A.  First Cause of Action for Violations of California Recording Law

209.    Statutory damages to Plaintiffs Fishman and Faria and the Class in the amount of $5,000 per violation, plus statutory interest.  *See* Cal. Pen. Code § 637.2(a)(1).

210.    An Order from this Court prohibiting Tiger and CGC from making telemarketing calls to California consumers and businesses without immediately disclosing that the calls are being recorded and without obtaining the requisite consent.  *See* Cal. Pen. Code § 637.2(b).

211.    Attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

212.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

### B.  Second Cause of Action for Breach of Oral Contract

213.    Damages to Plaintiff Fishman and the Enrollee Sub-Class in the amount of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes,

other sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiff Fishman and the Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any consumer benefits.  Specifically, $247.19 - $120.75 = $126.44 plus taxes, sundry charges, and statutory interest for Fishman, and $61.87 - $27.82 = $34.05 plus taxes, sundry charges, and statutory interest for Faria.

214.    Attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

215.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

**C.  Third Cause of Action for Violations of the Consumers Legal Remedies Act**

216.    Actual damages to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and the Consumer Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, but in no case less than $1,000, plus taxes, other sundry charges, and statutory interest.  *See* Cal. Civ. Code § 1780(a)(1).

217.    An Order from this Court prohibiting Tiger from engaging in the false advertising described herein.  *See* Cal. Civ. Code § 1780(a)(2).

218.    Restitution to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and the Consumer Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiffs and the Consumer Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any customer benefits.  *See* Cal. Civ. Code § 1780(a)(3).

219.    Punitive damages in an amount to be determined by the jury and Court.  *See* Cal. Civ. Code § 1780(a)(4).

220.    Attorneys' fees.  *See* Cal. Civ. Code § 1780(3), Fed. R. Civ. Proc. 54(d)(2).  Also, by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public

interest and thereby confer a significant benefit on the general public or a large class of persons. The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

221.    Costs of suit.  *See* Cal. Civ. Code § 1780(3) and Fed. R. Civ. Proc. 54(d)(1).

**D.  Fourth Cause of Action for Fraud**

222.    An Order from this Court that Tiger fraudulently induced Plaintiffs Fishman and Faria and the Enrollee Sub-Class into enrolling in Tiger's Program, and the agreements between Tiger on the one hand, and Plaintiffs Fishman and Faria and the Enrollee Sub-Class on the other hand, are void.

223.    Damages to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and to the Enrollee Sub-Class in the amount of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and pre-and post-judgment interest.

224.    Punitive damages in an amount to be determined by the jury and Court.  *See* Cal.  Civ. Code § 3294.

225.    Attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

226.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

**E.  Fifth Cause of Action for Negligent Misrepresentation**

227.    Damages to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and the Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and pre- and post-judgment interest.

228.    Attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private

enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal.  Code Civ. Proc. § 1021.5.

229.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

**F.  Sixth Cause of Action for Violations of the False Advertising Law**

230.    Against Tiger and CGC, one or more Orders from this Court prohibiting Tiger and CGC from engaging in the false advertising described herein.  *See* Cal. Bus. & Prof. Code § 17535.

231.    Against Tiger, restitution to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and to the Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiffs and the Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any customer benefits.

232.    Against CGC, restitution to Plaintiffs and to the Enrollee Sub-Class of all monies paid by them to Tiger that in turn were passed on to CGC by Tiger.  CGC received a benefit in such monies at the expense of Plaintiffs and the Enrollee Sub-Class that it would be unjust for CGC to retain.

233.    Against Tiger and CGC, attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

234.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

**G.  Seventh and Eighth Causes of Action for Unfair Competition – Unlawful Prong**

235.    Against Tiger and CGC, one or more Orders from this Court prohibiting Tiger and CGC from engaging in the unlawful practices described herein.  *See* Cal. Bus. & Prof. Code § 17203.

236.    Against Tiger, restitution to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and to the Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other

sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiffs and the Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any customer benefits.  *See* Cal. Bus. & Prof. Code § 17203.

237.    Against CGC, restitution to Plaintiffs and to the Enrollee Sub-Class of all monies paid by them to Tiger that in turn were passed on to CGC by Tiger.  CGC received a benefit in such monies at the expense of Plaintiffs and the Enrollee Sub-Class that it would be unjust for CGC to retain.

238.    Against Tiger and CGC defendants, attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

239.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

**H.  Ninth Cause of Action for Unfair Competition – Unfair Prong**

240.    Against Tiger and CGC, one or more Orders from this Court prohibiting Tiger and CGC from engaging in the unfair practices described herein.  *See* Cal. Bus. & Prof. Code § 17203.

241.    Against Tiger, restitution to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and to the Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiffs and the Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any customer benefits.  *See* Cal. Bus. & Prof. Code § 17203.

242.    Against CGC, restitution to Plaintiffs and to the Enrollee Sub-Class of all monies paid by them to Tiger that in turn were passed on to CGC by Tiger.  CGC received a benefit in such monies at the expense of Plaintiffs and the Enrollee Sub-Class that it would be unjust for CGC to retain.

243.    Against Tiger and CGC, attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant

benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

244.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

## I. <u>Tenth Cause of Action for Unfair Competition – Fraudulent Prong</u>

245.    Against Tiger and CGC, one or more Orders from this Court prohibiting Tiger and CGC from engaging in the fraudulent practices described herein.  *See* Cal. Bus. & Prof. Code § 17203.

246.    Against Tiger, restitution to Plaintiffs ($126.44 to Fishman and $34.05 to Faria, plus taxes, sundry charges, and statutory interest) and to the Enrollee Sub-Class of all monies paid to Tiger in excess of what they would have paid to their former gas providers, plus taxes, other sundry charges, and statutory interest, because Tiger received a benefit in the form of monies, and Tiger's retention of that benefit at the expense of Plaintiffs and the Enrollee Sub-Class is unjust because was based on falsely advertising the Program as free and that the price cap had any customer benefits.  *See* Cal. Bus. & Prof. Code § 17203.

247.    Against CGC, restitution to Plaintiffs and to the Enrollee Sub-Class of all monies paid by them to Tiger that in turn were passed on to CGC by Tiger.  CGC received a benefit in such monies at the expense of Plaintiffs and the Enrollee Sub-Class that it would be unjust for CGC to retain.

248.    Against Tiger and CGC, attorneys' fees, because by prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make an award of attorneys' fees appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.  *See* Cal. Code Civ. Proc. § 1021.5.

249.    Costs of suit.  *See* Fed. R. Civ. Proc. 54(d)(1).

## J. <u>Additionally</u>

250.    Certification of the Proposed Class, Do Not Call Sub-Class, Enrollee Sub-Class, and Consumer Enrollee Sub-Class and notice thereto to be paid by Tiger.

251.    Plaintiffs seek pre-judgment and post-judgment interest.

252.    Plaintiffs seek any and all other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury.

THE LAW OFFICES OF DANIEL BALSAM

Date:_____October 6, 2017_____     BY:___/s/ Daniel L. Balsam___

                                    DANIEL BALSAM
                                    Attorneys for Plaintiffs
                                    and the Proposed Class

**FIRST AMENDED CLASS ACTION COMPLAINT**

<u>Exhibit A</u>

Transcript of Tiger/CGC's Call to Fishman

**Tiger Natural Gas Inc./Community Gas Center Call to Emily Fishman, August 18, 2015**

<u>**FIRST CALL – TIGER/CGC'S SALES CALL TO FISHMAN**</u>

| | |
|---|---|
| 0:00 | COMMUNITY GAS CENTER: Hi, this is Olivia from the Community Gas Center.  I need to speak to the authorized person who handles the PG&E bill please. |
| 0:09 | EMILY FISHMAN: Oh.  That's, that's me. |
| 0:11 | CGC: Well good afternoon to you.  I'm calling from the CGC customer service department regarding your PG&E account. |
| 0:18 | FISHMAN: Yeah? |
| 0:18 | CGC: I'm just following up to give you a courtesy call regarding a notice that you received with your bill last year.  Your account is currently subject to several rate increases which already started.  The California… |
| 0:29 | FISHMAN: Which are I'm sorry? |
| 0:31 | CGC: I said which has already started.  It started, the 18.8% increase started this year, and then you'll see another 33% increase over the next three years.  So we set up… |
| 0:41 | FISHMAN: Oh.  Why is that? |
| 0:43 | CGC: The California Public Utilities Commission has processed that request from PG&E.  So what we do is we set up price protection for all the residential customers, which is a free service through PG&E's aggregation program, which will protect customers from the supply rate increases for the next three years. |
| 1:02 | FISHMAN: Oh.  So all customers are being subject to an increase in pricing? |
| 1:09 | CGC: Yes.  Yes. |
| 1:10 | FISHMAN: Wow. |
| 1:11 | CGC: Yes.  In the letter, I know most people, if you're like me, you just take your bill, you open it, you pay what you have to pay, and you throw em away or you put 'em out.  But in that letter last year… |
| 1:20 | FISHMAN: Yep.  Yep |
| 1:20 | CGC: It was telling you, it was telling you about the subject to several rate increases and umm… |
| 1:25 | FISHMAN: Ohhhh. |
| 1:27 | CGC: It also had that, y'know, bold print where it tells you about the 33% increase for the next three years… |
| 1:32 | FISHMAN: Got it. |
| 1:32 | CGC: And the 10% of this year.  So basically what this program is, it's a great program because it's price protection, which gives you a variable rate based on the market price, with a cap at 69 cents.  So of course when the cost of gas is down you do get the lower rate based on the lower cost, but when that cost of gas goes up and you know, most people are subject to the change, you won't, you'll be capped at a rate, excuse me, a rate cap of 69 cents.  So say for instance if PG&E down the line in the next year paid $1.06 per therm for the gas, you wouldn't be charged $1.06 per therm for your gas.  You would be charged 69 cents because it can never go over that price. |
| 2:15 | FISHMAN: And so, to participate in the program, what does that mean?  Are you calling all of your, the PG&E customers? |
| 2:26 | CGC: Yes, we're calling ehhhhhvery one of you guys.  Allllllll of you [Laughs].  And… |
| 2:28 | FISHMAN: Right. |
| 2:28 | CGC: And most people they get, they're on the program, they really enjoy the program, and they stay with it.  Some people feel like hey, the program's great, but it just didn't |

**Tiger Natural Gas Inc./Community Gas Center Call to Emily Fishman, August 18, 2015**

| | |
|---|---|
| | change my bill and it's still low so I don't need it, and you know, they just opt out and there's no fee for that either. There's no fee to set it up. It's all free. And the only reason that PG&E can't offer you it themselves is because the California Public Utilities Commission requires that a third party company which is us, that's unaffiliated with PG&E, set up the service, because it is against the law for them to profit off the gas itself. |
| 3:01 | FISHMAN: Interesting. Okay. Ummmm, and so to set this up, what is, what does that mean, I mean what does it take? |
| 3:10 | CGC: Well, to set this up, what we do, how the process works, we, I'm going to verify all this information I have and make sure it's correct in my system, but then we, we just have you have your PG&E bill handy, we go through a couple things. First, we check to see if the services are directed to the same as on your PG&E bill, and then we |
| 3:28 | FISHMAN: Right. |
| 3:28 | CGC: And then we need to know if you're with, we need to know if your bill says "current gas charges" or "current PG&E gas delivery charges," and we go over what those two things mean, and we just simply get your service agreement ID number and your rate schedule, and that's what pops up the automated system. And she just, you know, explains to you that Tiger Natural Gas will supply your gas, because a lot of people don't know you do have the option of picking who you want your gas supplier to be. And currently what PG&E does, every month they get their gas from just random sources, you know, and none of those gas people that they're getting it from are protected from future rate increases. So basically they can only secure your gas for one month, and after that month, it's not secure, and then you know, you just keep, it's a monopoly. So now they're able to deliver your gas from a supply source that's protected from rate increases for the next three years. And that's the PG&E core gas aggregation service. |
| 4:26 | FISHMAN: Okay. Well, sounds good. |
| 4:27 | CGC: After she prompts, after she comes on the line, she's going to ask you a couple questions, and then she'll give you your confirmation number. And I'll still be on the line with you just in case you have any questions or anything that you need to be answered that can be understand. |
| 4:43 | FISHMAN: Right. |
| 4:44 | CGC: And then every year, if it's, if it's something that you would like, every year we would send you a rate increase analysis report, and that basically tells you that PG&E bought your gas from, for such and such price, but how low of a price that you paid for your gas. |
| 5:01 | FISHMAN: Okay. |
| 5:02 | CGC: And we keep you, you know, updated on all the little things. I'm just going to verify, I'm showing that the service address, I only have half of it, of where PG&E delivers your gas. I have your city as Mill Valley… |
| 5:14 | FISHMAN: Yes. |
| 5:15 | CGC: I have your state as California. |
| 5:16 | FISHMAN: Yes. |
| 5:17 | CGC: And I also have your zip code as 94941. |
| 5:21 | FISHMAN: Yes. |
| 5:22 | [CGC confirms the spelling of Fishman's name, her street address, and that she only has |

**Tiger Natural Gas Inc./Community Gas Center Call to Emily Fishman, August 18, 2015**

|       | one account.]                                                                                                                                                                                                                                                                                           |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 5:50  | CGC: Okay, so how it works, the price protection is going to start on your next available meter read date, and once you go through the automated system and add your confirmation number [unintelligible] you will be all set.                                                                             |
| 6:01  | FISHMAN: Okay.                                                                                                                                                                                                                                                                                           |
| 6:01  | CGC: PG&E will then automatically start delivering your gas from a gas source providing the rate increase protection, so your gas will be protected from now on.                                                                                                                                          |
| 6:09  | FISHMAN: Okay.                                                                                                                                                                                                                                                                                           |
| 6:09  | CGC: And everything will stay the same with your PG&E utility service.  So you'll pay that bill just like you do now.  If you have any emergencies or questions, you'll still contact them.                                                                                                                |
| 6:19  | FISHMAN: Okay.                                                                                                                                                                                                                                                                                           |
| 6:19  | [At CGC's request, FISHMAN looks at her PG&E bill to provide her service agreement ID number and rate schedule.]                                                                                                                                                                                          |
| 11:21 | [CGC and advises Fishman of a forthcoming free program that will save 25% off electricity rates and says Tiger will contact her when it's available.]                                                                                                                                                     |
| 12:01 | [CGC says PG&E requires FISHMAN go through an automated verification system to verify information.]                                                                                                                                                                                                       |
| 12:25 | [CGC says it's a three-year program and automatically renews but FISHMAN can call and opt out anytime she wants.  If the program isn't available, FISHMAN will receive a variable rate pricing that's competitive with utilities, lower rate even when utility charges more.]                             |
| 12:55 | [CGC says nothing changes with PG&E service, source of gas will be Tiger Natural Gas, who is registered with PG&E.  PG&E utility service remains the same.]                                                                                                                                                |
| 13:09 | [CGC explains more on automated verification.]                                                                                                                                                                                                                                                           |
| 14:08 | [CGC transfers FISHMAN to automated verification system.]                                                                                                                                                                                                                                               |

## SECOND CALL – AUTOMATED VERIFICATION SYSTEM

|       |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 0:00  | This is the Verbatim TPV system to confirm Tiger Natural Gas as your CTA gas source in PG&E's core gas aggregation program for your PG&E account.  If I have your permission to record this call, please say yes after the tone and then press the pound key.                                                                                                                                                                                                                                                                            |
| 0:21  | FISHMAN: Yes. #                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                        |
| 0:23  | [SYSTEM confirms enrollment date, time, first & last name, service & mailing address, gas service ID #]                                                                                                                                                                                                                                                                                                                                                                                                                                |
| 1:25  | SYSTEM: Tiger will provide your natural gas supply in PG&E's core gas aggregation program, and you'll be guaranteed to receive reliable service, starting on your next available meter read.  Tiger is an unaffiliated CTA that has completed PG&E's certification process.  Your natural gas supply will receive price protection with a rate cap of 69 cents per therm for the next 36 months.  PG&E will continue to deliver your natural gas, send your monthly PG&E bill, and provide the exact same utility service.  If you understand and wish to enroll your gas accounts with Tiger as your natural gas supplier, please say "yes" after the tone and then press the pound key. |
| 2:14  | FISHMAN: Yes. #                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                        |
| 2:16  | SYSTEM: Accepted customers will be sent a confirmation letter and terms and                                                                                                                                                                                                                                                                                                                                                                                                                                                            |

**Tiger Natural Gas Inc./Community Gas Center Call to Emily Fishman, August 18, 2015**

|  |  |
|---|---|
|  | conditions within three business days.  Price protection will be applied to your gas supply and does not include PG&E's delivery charges; taxes; daily, quarter, and capacity costs.  You can rescind this enrollment within three business days or cancel at any time by contacting the Tiger enrollment agency at 888-ENERGY-HELP.  If you understand, and you are the customer of record or an authorized person to choose a natural gas supplier, please say "yes" after the tone, and then press the pound key. |
| 3:01 | FISHMAN: Yes. # |
| 3:03 | SYSTEM: Your confirmation number is 5004285.  Your confirmation number is 50004285. |

<u>Exhibit B</u>

Page From Tiger's Website as of July 2016

Tiger Natural Gas » PG&E Landing Page                    http://tigernaturalgas.com/switch-pge-customer-service/



**INFO@TIGERNATURALGAS.COM**

**1.888.875.6122**

| HOME | ABOUT | SERVICES | TESTIMONIALS | NEWS | FAQ | CONTACT | PARTNERS | AFFILIATES |



**QUESTIONS?**
Give us a call.

(888) 875.6122 ext. 4

**SEARCH TIGER**

[                    ]  SEARCH

**WHY TIGER?**

Why do over 30,000 Customers choose Tiger?



Proven performance
Cost savings
Customer service
20 years in business
Minority-owned business
A+ BBB Rating

 

## GET CONSISTENT ENERGY SAVINGS.

**JOIN 25,000 PG&E CUSTOMERS SAVING 9-15%* EVERY YEAR.**

Thousands of PG&E customers are lowering their energy bills and getting better customer service by switching to Tiger. As the largest third-party core natural gas provider in the PG&E area, we have a 20-year track record of consistent savings.

It's easy to make the switch. After you sign up, you continue to receive one bill from PG&E, with Tiger listed as your supplier.

 

 



California Restaurant Association

"The economic climate is tougher



Better Business Bureau

A+ Customer Service Rating



PepsiCo Inc.

"Tiger's attention to detail has

than anything we've seen in recent history, and yet still Tiger is committed to flexible and responsive service."

**Jot Condie**
*President & CEO*

20 years good standing ZERO complaints

helped us control overhead costs. Their pricing is consistently competitive and they provide flexibility in their contract terms."

**Daniel P. Lopez**
*Energy Procurement Manager*

*\*\*Most Tiger customers save 9 to 15% or more, year after year.*

Home | Services | Service Area | FAQs | Testimonials | Community | Help | Sitemap | Contact Us | Privacy Policy

**918.491.6998**
**1.888.875.6122**
info@tigernaturalgas.com
1422 East 71st Street
Tulsa, OK 74136-5060

©2015 Tiger Natural Gas.
Website Design by **Aqua Vita**






Enter your email here

SIGN UP



<u>Exhibit C</u>

Oklahoma BBB's Webpage for Tiger as of July 2016

Tiger Natural Gas, Inc. Review - Natural Gas Companies in Tulsa...          http://www.bbb.org/tulsa/business-reviews/natural-gas-companies/t...

Overview > Accredited Business Directory > Natural Gas Companies > Tiger Natural Gas, Inc.

# BBB Business Review

**BBB ACCREDITED BUSINESS SINCE 5/1/2008**

## Tiger Natural Gas, Inc.

Phone: (918) 491-6998

*View Additional Phone Numbers*

1422 East 71st Street  Suite J, Tulsa, OK 74136

https://tigernaturalgas.com/

 

**On a scale of A+ to F**
Reason for Rating
BBB Ratings System Overview

*BBB Business Reviews may not be reproduced for sales or promotional purposes.*

### Request a Quote
Request a Quote from Tiger Natural Gas, Inc.

## BBB Accreditation

A BBB Accredited Business since 5/1/2008

BBB has determined that Tiger Natural Gas, Inc. meets BBB accreditation standards, which include a commitment to make a good faith effort to resolve any consumer complaints. BBB Accredited Businesses pay a fee for accreditation review/monitoring and for support of BBB services to the public.

BBB accreditation does not mean that the business' products or services have been evaluated or endorsed by BBB, or that BBB has made a determination as to the business' product quality or competency in performing services.

## Reason for Rating

BBB rating is based on 13 factors. Get the details about the factors considered.

Factors that *raised* the rating for Tiger Natural Gas, Inc. include:

Length of time business has been operating
Complaint volume filed with BBB for business of this size
Response to 20 complaint(s) filed against business
Resolution of complaint(s) filed against business

## Customer Complaints Summary                    Read complaint details

20 complaints closed with BBB in last 3 years | 10 closed in last 12 months

| Complaint Type | Total Closed Complaints |
|---|---|
| Advertising/Sales Issues | 4 |
| Billing/Collection Issues | 4 |
| Delivery Issues | 2 |
| Guarantee/Warranty Issues | 0 |
| Problems with Product/Service | 10 |
| Total Closed Complaints | 20 |

Read Complaints | Definitions | BBB Complaint Process | File a Complaint against Tiger Natural Gas, Inc.
See Trends in Complaints on Tiger Natural Gas, Inc. | View Complaints Summary by Resolution Pie Chart on
Tiger Natural Gas, Inc.

## Customer Reviews Summary                    Read customer reviews

1 Customer Review on Tiger Natural Gas, Inc.

| Customer Experience | Total Customer Reviews |
|---|---|
| Positive Experience | 0 |
| Neutral Experience | 0 |
| Negative Experience | 1 |
| Total Customer Reviews | 1 |

Read Customer Reviews | Submit a Customer Review | See Trends in Customer Reviews on Tiger Natural Gas,
Inc.

## Government Actions

BBB knows of no government actions involving the marketplace conduct of Tiger Natural Gas, Inc..

What government actions does BBB report on?

## Advertising Review

BBB has nothing to report concerning Tiger Natural Gas, Inc.'s advertising at this time.

What is BBB Advertising Review?

## Additional Information

BBB file opened: March 03, 2005
Business started: 05/15/1991
Business started locally: 05/15/1991
Business incorporated 01/01/1991 in OK

**Type of Entity**
Corporation

**Business Management**
Lori Nalley, Owner/President
Mr. Johnathan Burris, Manager
Ms. Rachel Harvick, Operations

**Contact Information**
Customer Contact: Mr. Johnathan Burris, Manager
Principal: Lori Nalley, Owner/President

**Business Category**
Natural Gas Companies



Directions | Enlarge

## Customer Review Rating plus BBB Rating Summary

Tiger Natural Gas, Inc. has received 3.68 out of 5 stars based on 1 Customer Reviews and a BBB Rating of A+.



BBB Customer Review Rating plus BBB Rating Overview

## QUICK LINKS

What is a BBB Business Review?

BBB Reporting Policy

About Enhanced Services

File a Complaint against Tiger Natural Gas, Inc.

Request a Quote from Tiger Natural Gas, Inc.

Accredited Business Directory

## CUSTOMER REVIEWS

Read Customer Reviews

Submit a Customer Review

See trends in Customer Reviews for Tiger Natural Gas, Inc.